DAVID P. MASTAGNI (SBN 57721)
PHILLIP R.A. MASTAGNI (SBN 238254)
KENNETH BACON (SBN 104194)
**MASTAGNI HOLSTEDT, APC**
1912 "I" Street
Sacramento, California 95811
Telephone: (916) 446-4692
Facsimile: (916) 447-4614
Email: dmastagni@mastagni.com
Email: phillip@mastagni.com
Email: kbacon@mastagni.com

Daniel R. Miller (PA Bar No. 68141)
Russell D. Paul (PA Bar No. 71220)
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
Email: dmiller@bm.net
Email: rpaul@bm.net

*Attorneys for Relator*

FILED

Oct 21, 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

# SEALED

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA, THE STATE OF CALIFORNIA *ex rel.* PAUL VILLAMIZAR,<br><br>Plaintiffs,<br><br>v.<br><br>SENIOR CARE PHARMACY SERVICES INC. and SAMITENDU BANERJEE,<br><br>Defendants. | CASE NO.: 2:14-CV-1737-TLN-KJN<br><br>**FIRST AMENDED COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *ET SEQ.* AND CALIFORNIA FALSE CLAIMS ACT, CAL. GOVT. CODE §§ 12650 *ET SEQ.*<br><br>FILED IN CAMERA AND UNDER SEAL JURY TRIAL DEMANDED** |

Plaintiff, Paul Villamizar ("Relator"), on behalf of the United States of America and the

State of California, brings this case against Senior Care Pharmacy Services Inc. ("Senior Care" or

"Defendant" or "the Company") for violations of the Federal False Claims Act ("FCA"), 31

U.S.C. §§ 3729 *et seq.,* and The California False Claims Act, Cal. Govt. Code §§ 12650 *et seq.*, to

recover all damages, civil penalties and all other recoveries provided for under these Acts.

///

1

UNDER SEAL FIRST AMENDED COMPLAINT - *U.S. et al. ex rel. Villamizar v. Senior Care Pharmacy, Inc.*

# I.   SUMMARY OF THE ACTION

1.   From 2011 through the present, and likely earlier, Senior Care has submitted false claims for reimbursement for certain prescriptions to Medicare, and Medi-Cal.

2.   Nursing homes provide nursing care and prescription drugs to their patients. To do so, nursing homes need reliable pharmacy services. Defendant provided and currently provides such "institutional pharmacy" services pursuant to contracts with nursing homes.

3.   The nursing home pharmacy model is a "single source" approach due to the administrative and practical complexities involved in providing pharmaceuticals to nursing home patients. That is, nursing homes typically select a single institutional pharmacy to provide prescription drugs to all of that nursing home's residents, regardless of each patient's type of insurance (e.g., Medicaid, Medicare Part A, Medicare Part D, or private insurance).

4.   In the latter part of 1998, Medicare changed its payment methodology with respect to Medicare Part A patients in nursing homes. Instead of nursing homes "passing through" the cost of prescription drugs to Medicare, Medicare began paying a fixed sum to nursing homes for the care of nursing home patients, including the cost of prescription drugs. Due to the change, nursing home owners were abruptly placed at financial risk for the costs of prescription drugs provided to these Medicare Part A patients.

5.   As a result of this incentive structure, Defendants created an illegal kickback scheme which involved a practice known as "swapping." Specifically, Defendants offered commercially unreasonable, below fair-market-value prices for prescription drugs to nursing homes for the nursing homes' Part A patients, in exchange for the opportunity to provide prescription drugs, at a substantially higher, market-driven cost, to the nursing home's Medi-Cal and Medicare Part D patients. The nursing homes agreed.

6.   Defendants provided commercially unreasonable prescription drug prices to nursing homes for their Medicare Part A patients in several forms, including the use of: 1) steeply discounted per diem prices, 2) steeply discounted prices for drugs that were excluded from the per diem arrangement, and 3) no charges at all for drugs that were excluded from the per diem arrangement. The goal of each was always to induce nursing homes to provide the higher-paying

2

UNDER SEAL FIRST AMENDED COMPLAINT - *U.S. et al. ex rel. Villamizar v. Senior Care Pharmacy, Inc.*

1  government payor business. Stated differently, to compensate for the profit it was losing when it
2  charged nursing homes below fair-market-value prices for drugs (for the nursing homes'
3  Medicare Part A patients), Defendants relied on the higher paying business paid for by Medi-Cal
4  and Medicare Part D that those same nursing homes guaranteed to Defendants as a quid pro quo.

5       7.    The scheme was made possible due to two realities of the nursing home industry.
6  First, Defendants knew, as practical matter, it was not feasible for a nursing home to have more
7  than one institutional pharmacy because of, inter alia, the complex administrative burdens
8  inherent in nursing home pharmaceutical services. Second, due to the payor demographics in
9  nursing homes, Defendants could afford a "loss leader." Specifically, in the average nursing
10 home, only a small percentage of the patients are covered under Medicare Part A. The vast
11 majority of patients are covered by Medicaid, private insurers, and, as of January 1, 2006,
12 Medicare Part D. Consequently, Defendants could afford to offer below fair-market-value prices
13 on Medicare Part A prescriptions when the nursing home was the customer, because, in return,
14 the nursing homes guaranteed Defendants all of their Medicaid and Medicare Part D business and
15 Defendants recovered any profit it lost on Medicare Part A prescriptions through the market-
16 based prices being paid by Medicaid and Medicare Part D for prescriptions it supplied to patients
17 who had those government health insurance plans. Thus, Defendants used the taxpayer-funded
18 Medicaid and Medicare Part D programs to subsidize steep discounts – otherwise known as
19 kickbacks – to privately owned nursing homes.

20      8.    This swapping/kickback arrangement has been specifically addressed in a host of
21 government program guidances and advisory opinions. These authorities uniformly hold that
22 swapping implicates the Anti-Kickback Statute ("AKS"), and is not protected by the "discount
23 safe harbor."

24      9.    In addition to violating the AKS, swapping violates the drug pricing rules of the
25 California State Medicaid Program, known as Medi-Cal, by charging Medi-Cal higher prices for
26 prescription drugs than other comparable payers.

27      10.   By using the Medicaid and Medicare Part D Programs to subsidize kickbacks to
28 nursing home owners, the Defendants profited handsomely at the expense of the Government

1   Plaintiffs.

2       11.     The new prescription drug benefit under Medicare Part D became effective on

3   January 1, 2006.  With Medicare Part D, as with Medicaid, Defendants received fair-market-value

4   reimbursements from government payers.    Defendants used that profit to subsidize its

5   commercially unreasonable discounts to nursing homes for Part A patients.

6       12.     The amount of money flowing from the government to the Defendants is $20 to

7   $30 million each year.   Every dollar of government money that was subject to the kickback

8   scheme described above is recoverable through this lawsuit.

9       13.     In addition to the kickback scheme, the Company is also unilaterally switching

10  nonbioequivalent pharmaceutical alternative forms of drugs (between capsules, pills, liquids and

11  solids) to whichever form of the same drug has the widest margins and offers the Company the

12  greatest amount of profit, without a physician's approval.  Also, the Company is duping doctors

13  to agree to switch to different medications that are in the same class or have similar therapeutic

14  effects but are cheaper or more profitable for the Company, and are doing so by misrepresenting

15  that the originally prescribed medication was not covered by the patient's insurance.

16      14.     Senior Care employees also restock medication that was returned from the SNFs,

17  including controlled substances that have been returned.  These medications are then redispensed

18  and billed again to the government, without any corresponding cost to the company.

19      15.     The Company is also billing Medi-Cal with exorbitant mark-ups and with prices

20  that are not the required most favorable prices – they are significantly higher than prices offered

21  by the Company to other similarly situated purchasers.

22      16.     Lastly, the Company has engaged in a series of violations in connection with the

23  improper dispensing of controlled substances, including dispensing Schedule II controlled

24  substances (C2s) to Medicare and Medi-Cal beneficiaries and others without a valid prescription.

25  Furthermore, Senior Care has failed to report improper usage of controlled substances by long

26  term care facilities, which further acts as an inducement for those facilities to continue their

27  business arrangements with Senior Care.

28  ///

## II.    THE PARTIES

17.    Defendant Senior Care Pharmacy Services Inc. ("Senior Care"), a California corporation founded in 2002 with its corporate office at 12600 Hoover Street, Garden Grove, CA 92841, is an independently owned provider of pharmaceutical, infusion therapy, enteral nutrition, and consulting services to California long term care (LTC) facilities.    Senior Care operates pharmacies at the following California locations:

> Garden Grove Office (Orange County)
> 12600 Hoover Street
> Garden Grove, CA 92841
> Phone:(714) 891-1800
>
> Sun Valley Office (Los Angeles)
> 8000 Wheatland Ave
> Suite I
> Sun Valley, CA 91352
> Phone:(818) 394-6100
>
> Fairfield Office (San Francisco/Sacramento)
> Senior Care Pharmacy Services Inc.
> 4950 Fulton
> Fairfield CA 94534
> Phone: (707) 673-9800
>
> Office maintained in India:
>
> 6-2-56/2 ParkView Enclave
> Road# 12, Banjara Hills
> Hyderabad, AP 500034
> Phone: +91-40-64577014

18.    Defendant Samitendu Banerjee is the sole Owner, President and Chief Pharmacist of Senior Care.

19.    Defendant Ara Keusgarian is a supervisor at Senior Care.

20.    Defendant Tony Nguyen is supervisor at Senior Care.

21.    The United States is a plaintiff to this action.    The United States brings this action on behalf of the Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS").

22.    The State of California is also a plaintiff in this action.    The State of California brings this action on behalf of the California Department of Health Care Services Medicaid program, Medi-Cal.

23. Relator Paul Villamizar ("Relator") is a resident of Benicia, California. He began work at Senior Care on May 8, 2013 at the Senior Care pharmacy in Fairfield, CA ("Fairfield") as a Pharmacist. The allegations in this Complaint are based in part upon information Relator discovered through his work at Senior Care and through his own personal efforts, observations and investigation. None of the actionable allegations set forth in the Complaint are based on a public disclosure as set forth in 31 U.S.C. §3730(e)(4). Notwithstanding same, Relator is an original source of the facts alleged herein.

## III. JURISDICTION AND VENUE

24. Jurisdiction is founded upon the Federal False Claims Act (the "Act" or the "False Claims Act"), 31 U.S.C. § 3729 *et seq.*, specifically 31 U.S.C. § 3732(a) and (b), and also 28 U.S.C. §§ 1331, 1345. Pursuant to 28 U.S.C. § 1367, there is supplemental jurisdiction related California state law claims.

25. Venue in the Eastern District of California is appropriate under 31 U.S.C. § 3732(a) in that, at all times material to this civil action, Defendants transacted business in the Eastern District of California, or submitted or caused the submission of false claims in the Eastern District of California.

## IV. THE MEDICARE AND MEDICAID PROGRAMS

### A. Medicare Part A

26. Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq., established the Medicare program. The United States, through HHS, and its sub-agency, CMS, administers the Medicare Program. Part A of the Medicare program ("Part A") covers inpatient services furnished to Medicare beneficiaries by participating providers, including hospitals and nursing homes. 42 U.S.C.S. § 1395d(a).

27. Nursing homes, a/k/a "skilled nursing facilities" or "SNFs," are reimbursed under Part A. A nursing home is an "institution (or distinct part of an institution) which is primarily engaged in providing to residents (A) skilled nursing care and related services for residents who require medical or nursing care, or (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons." 42 U.S.C. § 1395i-3(a)(1). A nursing home may be freestanding, or it

6

UNDER SEAL FIRST AMENDED COMPLAINT - *U.S. et al. ex rel. Villamizar v. Senior Care Pharmacy, Inc.*

may be part of a hospital. See 42 U.S.C. § 1395yy(a) (discussing reimbursements for both hospital-based and freestanding SNFs).

28.     In order to participate in Medicare Part A, a nursing home must execute Form CMS-855A, the Medicare Enrollment Application for institutional providers. As part of completing the CMS-855A, a certification must be executed, which reads in pertinent part:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

29.     Under Medicare Part A, a nursing home provides "post-hospital extended care services for up to 100 days during any spell of illness." 42 U.S.C. § 1395d(a)(2). Pursuant to 42 U.S.C. § 1395x(h), "extended care services" include "such drugs [and] biologicals, . . . furnished for use in the skilled nursing facility, as are ordinarily furnished by such facility for the care and treatment of inpatients." This includes prescription drugs.

30.     Prior to July 1, 1998, Medicare Part A reimbursed nursing homes for prescription drugs on an "actual cost" basis, i.e., the institutional pharmacy billed the nursing home for each prescription provided to each patient, and the nursing home later recouped those costs from Medicare through a cost-reporting process that permitted the nursing homes to "true up" to their actual costs. In other words, nursing homes "passed through" all prescription drug costs for Part A patients to the federal government.

31.     Consequently, when making a choice regarding which institutional pharmacy to use, nursing homes did not focus on cost. Instead, they chose the pharmacy based on the needs of their patients, and the quality of services provided by the pharmacy. Relevant factors included, inter alia, the breadth of the pharmacy's drug formulary (vis-à-vis the prescription drug needs of the residents), whether the pharmacy offered patient-centric services (e.g., maintaining individual patient drug profiles, maintaining a battery of emergency prescriptions, providing daily delivery services, providing consultant services to assist doctors and nurses, attending the nursing home's quality assurance and infectious disease committee meetings, and providing in-service training to

nursing home employees) and certain logistical issues, e.g., how far away was the pharmacy in the event that additional emergency prescriptions were needed.

32. Effective July 1, 1998, Congress changed the reimbursement methodology for nursing home services covered under Part A to be prospective payment system ("PPS"). Under PPS, the government reimbursed nursing homes for Part A patients based on a flat, per day rate ("per diem rate"). 42 U.S.C. § 1395yy(e). Thus, after July 1, 1998, Medicare Part A began paying nursing homes a flat rate to provide medical care and prescription drugs to residents.

33. Under this system, which remains in effect today, nursing homes no longer are reimbursed on an actual cost basis, and thus they can no longer pass-through prescription drug costs to Medicare. Instead, nursing homes pay the institutional pharmacies directly for the cost of the drugs – dollar-for-dollar – but are reimbursed a flat rate by Medicare Part A regardless of the amount the nursing homes actually spend on drugs for its Part A patients. Accordingly, under the PPS system, nursing homes are financially at risk for the drugs provided to Part A patients. Thus, nursing homes are incentivized to bargain for the lowest available prescription drug prices from the Defendants.

**B. The Medicaid Program**

34. Medicaid was created on July 30, 1965, through Title XIX of the Social Security Act. Medicaid is a cooperative federal-state program through which the federal government provides financial assistance to states so that they may furnish medical care to needy individuals. 42 U.S.C.S. § 1396 et seq.

35. Each state administers its own Medicaid Program. However, each state program is governed by federal statutes, regulations and guidelines. The federal portion of a state's Medicaid payments—the Federal Medical Assistance Percentage—is based on the state's per capita income compared to the national average. During the relevant time period, the Federal Medicaid Assistance Percentage for California was in the range of 50% to 65%.

36. The law requires state Medicaid plans to execute written agreements between the Medicaid agency and each provider furnishing services under the plan ("provider agreements"). 42 C.F.R. § 431.107(b).

8

UNDER SEAL FIRST AMENDED COMPLAINT - *U.S. et al. ex rel. Villamizar v. Senior Care Pharmacy, Inc.*

37.     Nursing homes and institutional pharmacies, such as Defendant, are "providers" who are required to sign provider agreements with each state Medicaid program with which the provider wishes to conduct business. Although there are variations in the agreements among the states, the agreements typically require the provider to agree that it will comply with all Medicaid requirements, as well as other federal and state laws, including any applicable Anti-Kickback provisions. In a number of states, the Medicaid claim form itself contains a certification by the provider that the provider has complied with all aspects of the Medicaid program, including compliance with Anti-Kickback laws.

38.     Among other things, the Medicaid programs of all states reimburse for prescription drugs. Many states [including California] award contracts to private companies to evaluate and to process claims for payment on behalf of Medicaid recipients. Typically, after processing the claims, these private contractors submit claims to the state Medicaid programs, which in turn obtain federal funds from the United States.

39.     Through this process, Defendants supplied prescription drugs to nursing home patients and presented, or caused to be presented, reimbursement claims to state Medi-Cal programs, their contractors, and the federal government.

**C.     The California Medicaid Program: "Medi-Cal"**

40.     The California Department of Health Care Services ("DHCS") (formerly the California Department of Health Services or "DHS") enacts regulations for California State's Medicaid program, Medi-Cal. As a participating Medi-Cal provider, Defendant was and is subject to DHSC regulations that, inter alia, require it to provide services to Medi-Cal patients at its most favorable rates. California Code of Regulations, title 22, section 51501, subdivision (a), requires as follows:

> no provider shall charge for any service or any article more than would have been charged for the **same service** or article to **other purchasers of comparable services or articles under comparable circumstances.** (Emphasis added.)

41.     Defendant, as a pharmacy is, and was, required to submit a Medi-Cal Pharmacy Provider Application. See 22 CCR §§ 51000.55; 51000.30.

///

9

UNDER SEAL FIRST AMENDED COMPLAINT - *U.S. et al. ex rel. Villamizar v. Senior Care Pharmacy, Inc.*

42.     As part of the application, DHCS Form 6205, pharmacies are required to submit *inter alia* a Medi-Cal Provider Agreement. Among other commitments, as part of the Medi-Cal Provider Agreement, Defendant agreed to, inter alia, comply with the laws and regulations, not engage in fraud and abuse and keep and maintain all necessary records.

43.     Defendant's Medi-Cal Provider Agreement also made clear its duty, consistent with the program's public purposes, to charge its lowest fees to DHCS and refrain from conduct that would harm the Medi-Cal program or its beneficiaries. Among other commitments, Defendant agreed to do all of the following:

> **Compliance with Laws and Regulations**. Provider agrees to comply with all applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code (commencing with Sections 14000 and 14200), and any applicable rules or regulations promulgated by DHS pursuant to these chapters.
>
> **Forbidden Conduct.** Provider agrees that it shall not engage in conduct inimical to the public health, morals, welfare and safety of any Medi-Cal beneficiary, or the fiscal integrity of the Medi-Cal program.
>
> **Provider Fraud and Abuse.** Provider agrees that it shall not engage in fraud or abuse.
>
> **Prohibition of Rebate, Refund or Discount.** Provider agrees that it shall not offer, give, furnish, or deliver any rebate, refund, commission, preference, patronage dividend, discount, or any other gratuitous consideration, in connection with the rendering of health care services to any Medi-Cal beneficiary. Provider further agrees that it shall not solicit, request, accept, or receive, any rebate, refund, commission, preference, patronage dividend, discount, or any other gratuitous consideration, in connection with the rendering of health care services to any Medi-Cal beneficiary. Provider further agrees that it shall not take any other action or receive any other benefit prohibited by state or federal law.

44.     In other words, Defendant agreed to bill Medi-Cal at its lowest rates, not to give or take kickbacks, and to conduct its business relationship with DHCS with a view to the program's public purpose and the welfare of California's medically indigent citizens.

45.     To seek reimbursement for a prescription drug, a pharmacy participating in Medi-Cal submits a claim to the contractor that administers the Medi-Cal program. In seeking reimbursement the pharmacy must state its charge for the particular drug.

46.     Using state funds, Medi-Cal pays a drug claim if the beneficiary is eligible, the provider is authorized to bill Medi-Cal, the drug is covered by Medi-Cal, and no information

10

UNDER SEAL FIRST AMENDED COMPLAINT - *U.S. et al. ex rel. Villamizar v. Senior Care Pharmacy, Inc.*

known to the Medi-Cal program indicates the claim is otherwise improper or in violation of billing rules. On a regular basis, Medi-Cal seeks reimbursement from the federal government for the federal share of the Medi-Cal expenditures. The claims that have been submitted to Medi-Cal are used to support the pharmacy's reimbursement request. In this way, if a pharmacy submits a fraudulent claim to Medi-Cal, it has caused a false claim to be submitted to both California and the federal government.

### D. Medicare Part D

47. The Medicare Part D program ("Part D") began on January 1, 2006. [1] Under Part D, institutional pharmacies submit claims to private insurance carriers ("Part D plans" or "Part D sponsors"). Part D plans enter into subcontracts with pharmacies to provide drugs to the Medicare Part D beneficiaries enrolled in their plans. These include subcontracts with long-term care pharmacies such as Defendant. These subcontracts are closely negotiated between Part D plans and institutional pharmacies, including Defendant in the instant case. Both the private insurers and the federal government share the financial risk presented by prescription drugs that are provided to beneficiaries.

48. The implementation of Medicare Part D marked a change in the federal-state fiscal relationship. Under Medicare Part D, the federal Medicare program finances a significant portion of the program using state dollars. The mechanism through which the states help pay for Medicare Part D is commonly referred to as the "clawback" (the statutory term is "phased-down State contribution"). *See* 42 CFR 423.910, published in 780 Fed. Reg. 4584. These "clawback" payments constitute the largest single source of state funds flowing to the federal government from fiscal year 2006 onward.

## V. THE APPLICABLE LAW

### A. The Federal False Claims Act

49. The Federal False Claims Act provides, in pertinent part, that:

---

[1] Part D was established by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066. Part D provided prescription drug insurance coverage to qualified Medicare beneficiaries beginning on January 1, 2006. 42 U.S.C. § 1395w-101(a)(1). Beneficiaries who are also eligible for Medicaid (the "dual-eligibles") are automatically enrolled in a Part D plan. Accordingly, primary Medicaid coverage for prescription drugs for dual-eligible persons ended on January 1, 2006.

11

UNDER SEAL FIRST AMENDED COMPLAINT - *U.S. et al. ex rel. Villamizar v. Senior Care Pharmacy, Inc.*

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or] (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid ...
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person....
>
> * * *
>
> (b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

50.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461and 64 Fed. Reg. 47099, 47103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

**B.      The Federal Anti-Kickback Statute**

51.     The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), ("AKS") arose out of congressional concern that remuneration provided to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or harmful to a vulnerable patient population. To protect the integrity of the Medicare and Medicaid programs from these harms, Congress enacted a prohibition against the payment of kickbacks in any form. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

52.     The AKS prohibits any person or entity from offering, making, soliciting, or accepting remuneration, in cash or in kind, directly or indirectly, to induce or reward any person

for purchasing, ordering, or recommending or arranging for the purchasing or ordering of federally-funded medical goods or services:

> whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both. 42 U.S .C. § 1320a-7b(b). Violation of the statute also can subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid.

42 U.S.C.§1320a-7(b)(7) and 42 U.S.C. §1320a-7a(a)(7). Violation of the statute also can subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. §1320a-7(b)(7) and 42 U.S.C. §1320a-7a(a)(7).

53. The Anti-Kickback Statute and the corresponding regulations establish a number of ''safe harbors'' for common business arrangements. The safe harbors protect arrangements from creating liability under the statute. An arrangement must fit squarely in a safe harbor to be protected. Safe harbor protection requires strict compliance with all applicable conditions set out in the relevant regulation. Once the plaintiff proves that the Anti-Kickback Statue applies, the burden shifts to the defendant to prove that its conduct fits within one of the exceptions.

54. The "discount" safe harbor is discussed at 42 C.F.R. §1001.952(h)(5) as follows:

> [T]he term discount means a reduction in the amount a buyer (who buys either directly or through a wholesaler or a group purchasing organization) is charged for an item or service based on an arms-length transaction. The term discount does not include --
>
> (ii) *Supplying one good or service without charge or at a reduced charge to induce the purchase of a different good or service*, unless the goods and services are reimbursed by the same Federal health care program using the same methodology and the reduced charge is fully disclosed to the Federal health care program and accurately reflected where appropriate, and as appropriate, to the reimbursement methodology;

(iii) *A reduction in price applicable to one payer but not to Medicare, Medicaid or other Federal health care programs.*

**C.      Applicable Government Program Guidance and Advisory Opinions**

55.      Swapping has been directly addressed in various statutes, regulations, program guidance, and advisory opinions for more than 20 years.  The authorities, without exception, hold that swapping violates the AKS.

56.      On July 29, 1991, in the preamble to the "discount" safe harbor, the OIG illustrated the problems with "swapping" and discussed the reasons why swapping is not protected by the discount safe harbor:

> [W]e are aware of cases where laboratories offer a discount to physicians . . but do not offer the same discount to the Medicare program.  In some of these cases, the discount offered to the physician is explicitly conditioned on the physician's referral of all of his or her laboratory business.  Such a "discount" does not benefit Medicare, and is therefore inconsistent with the statutory intent for discounts . . . .

56 Fed. Reg. 35977.

57.      Four years later, in December, 1994, the OIG warned in a Special Fraud Alert of the risks of such practices:

> The Medicare program pays for laboratory tests provided to patients with end stage renal disease (ESRD) in two different ways. Some laboratory testing is considered routine and payment is included in the composite rate paid by Medicare to the ESRD facility which in turn pays the laboratory. Some laboratory testing required by the patient is not included in the composite rate, and these additional tests are billed by the laboratory directly to Medicare and paid at the usual laboratory fee schedule price.
>
> The OIG is aware of cases where a laboratory offers to perform the tests encompassed by the composite rate at a price below fair market value of the tests performed. In order to offset the low charges on the composite rate tests, the ESRD facility agrees to refer all or most of its non-composite rate tests to the laboratory. This arrangement appears to be an offer of something of value (composite rate tests below fair market value) in return for the ordering of additional tests which are billed directly to the Medicare program.
>
> If offered or accepted in return for referral of additional business, the lab's pricing scheme is illegal remuneration under the anti-kickback statute. The statutory exception and "safe harbor" for "discounts" does not apply to immunize parties to this type of transaction, since discounts on the composite rate tests are offered to induce referral of other tests. See 42 C.F.R. §1001.952(h)(3)(ii).

OIG Special Fraud Alert (December 19, 1994).

58. Five years later, in 1999, the OIG commented more on such arrangements as follows:

> [s]uch price reductions create a risk that a supplier may be offering remuneration in the form of discounts on business for which the purchaser pays the supplier, in exchange for the opportunity to service and bill for higher paying Federal health care program business reimbursed directly by the program to the supplier. In such circumstances, neither Medicare nor Medicaid benefits from the discount; to the contrary, Medicare and Medicaid may, in effect, subsidize the other payer's discounted rates. . . . Accordingly, the discount safe harbor specifically excludes "a reduction in price applicable to one payor **but not to Medicare or a State health program.**" See 42 CFR §1001.952(h)(3)(iii).

OIG Advisory Opinion 99-2 (March 4, 1999), at pg. 5 (emphasis added).

59. The arrangement in question in OIG Advisory Opinion 99-2 involved ambulance companies providing nursing homes with steep discounts for transporting Medicare Part A patients, in exchange for the opportunity to provide ambulance services to nursing home patients covered by Medicare Part B and other federal programs under which the nursing home was not responsible for transportation costs. After concluding that the discount safe harbor was not applicable, the OIG provided the following analysis regarding the kickback implications of such an arrangement:

> The circumstances surrounding the arrangement suggest that a nexus may exist between the discount to the SNFs for PPS-covered transports and referrals of other Federal health care program business.[2] First, the SNFs are in a position to direct a significant amount of business to [the ambulance company] that is not covered under the PPS payment. Second, both parties have obvious motives for agreeing to trade discounts on PPS business for referrals of non-PPS business: the SNFs to minimize risk of losses under the PPS system and [the ambulance company] to secure business in a highly competitive market. Third, [the ambulance company's] request for an advisory opinion comes amidst a considerable number of informal inquiries and anecdotal reports regarding discounts to SNFs that this Office has received since enactment of SNF PPS [on July 1, 1998]. These inquiries and reports suggest that suppliers of a wide range of SNF services are giving SNFs discounts for PPS-business that are linked, directly or indirectly, to referrals of Part B business.

OIG Advisory Opinion 99-2 (March 4, 1999), at pgs. 5-6 [bracketing added].

---

[2] "We note that the Agreement contains statements to the effect that remuneration provided under the Agreement is not intended to induce referrals of other business. We find these statements self-serving and not persuasive" (footnote and quote in original).

60. OIG Advisory Opinion 99-2 goes on to provide additional insight regarding other, similar improper business arrangements:

> In evaluating whether an improper nexus exists between a discount and referrals of Federal business in a particular arrangement, we look for indicia that the discount is not commercially reasonable in the absence of other, non-discounted business. In this regard, discounts on SNF PPS business that are particularly suspect include, but are not limited to:
>
> - discounted prices that are below the supplier's cost, and
> - discounted prices that are lower than the prices that the supplier offers to a buyer that (i) generates a volume of business for the supplier that is the same or greater than the volume of Part A business generated by the PPS SNF, but (ii) does not have any potentially available Part B or other Federal health care program business.
>
> This is an illustrative, not exhaustive, list of suspect discounts; other arrangements may be equally suspect. Each of the above pricing arrangements independently gives rise to an inference that the supplier and the SNF may be "swapping" discounts on Part A business in exchange for profitable non-discounted Part B business, from which the supplier can recoup losses incurred on the discounted business . . . . In connection with items or services provided to PPS SNFs, the presence of **either** of these discount arrangements is particularly suspect under the anti-kickback statute. Other indicators of suspect discounts include (i) discounts on PPS-covered business that are coupled with exclusive supplier agreements and (ii) discounts on Medicare PPS or other capitated or prospective program business made in conjunction with explicit or implicit agreements to refer other facility business to the supplier, including Part B or other Federal health care program business.

OIG Advisory Opinion 99-2 (March 4, 1999), at pg. 6 (emphasis in original).

61. Finally, it should be noted that OIG Advisory Opinion 99-2 provided the following additional guidance with respect to swapping arrangements:

> The risk of improper "swapping" is compounded by the likelihood that SNFs will refer non-PPS business to their contracted PPS provider . . . as a matter of practical convenience . . . .

62. Such practical convenience factors are present here, in that it is highly impractical for nursing homes to have more than one in-house pharmacy. Thus, the supplier – here, Senior Care – knew to a practical certainty that if they could induce the nursing home by using the subsidized price, they would in return receive the vast majority of the nursing home's pharmaceutical business at full price.

63. In March 2000, the OIG issued a formal Program Guidance which discussed risk areas for nursing homes under the Anti-Kickback Statute. Citing OIG Advisory Opinion 99-2,

swapping was specifically identified as a problem, and was defined as follows:

> "Swapping" occurs when a supplier gives a nursing facility discounts on Medicare Part A items and services in return for the referrals of Medicare Part B business. With swapping, there is a risk that suppliers may offer a SNF an excessively low price for items or services reimbursed under PPS in return for the ability to service and bill nursing facility residents with Part B coverage. *See* OIG Advisory Opinion 99-2 (February 1999).

OIG Program Guidance for Nursing Facilities. 65 Fed. Reg. 14289 (March 16, 2000)(Ftn. 75).

64.    Although the Anti-Kickback Statute, particularly when combined with the authorities cited immediately above, prohibits the conduct at issue in this complaint, that conclusion was effectively codified on September 30, 2008, when the OIG issued an additional Program Guidance regarding "swapping" in the Medicare Part A nursing home context:

> Nursing facilities often obtain discounts from suppliers and providers on items and services that the nursing facilities purchase for their own account. In negotiating arrangements with suppliers and providers, a nursing facility should be careful that there is no link or connection, explicit or implicit, between discounts offered or solicited for business that the nursing facility pays for and the nursing facility's referral of business billable by the supplier or provider directly to Medicare or another Federal health care program. ***For example, nursing facilities should not engage in "swapping" arrangements by accepting a low price from a supplier or provider on an item or service covered by the nursing facility's Part A per diem payment in exchange for the nursing facility referring to the supplier or provider other Federal health care program business, such as Part B business excluded from consolidated billing, that the supplier or provider can bill directly to a Federal health care program. Such "swapping" arrangements implicate the anti-kickback statute and are not protected by the discount safe harbor.***
> As we have previously explained in other guidance, the size of a discount is not determinative of an anti-kickback statute violation. Rather, the appropriate question to ask is ***whether the discount is tied or linked, directly or indirectly, to referrals of other Federal health care program business.*** When evaluating whether an improper connection exists between a discount offered to a nursing facility and referrals of Federal health care program business billed by a supplier or provider, suspect arrangements include below-cost arrangements or arrangements at prices lower than the prices offered by the supplier or provider to other customers with similar volumes of business, but without Federal health care program referrals. Other suspect practices include, but are not limited to, discounts that are coupled with exclusive provider agreements and discounts or other pricing schemes made in conjunction with explicit or implicit agreements to refer other facility business. ***In sum, if any direct or indirect link exists between a price offered by a supplier or provider to a nursing facility for items or services that the nursing facility pays for out-of-pocket and referrals of Federal business for which the supplier or provider can bill a Federal health care program, the anti-kickback statute is implicated.***

UNDER SEAL FIRST AMENDED COMPLAINT - *U.S. et al. ex rel. Villamizar v. Senior Care Pharmacy, Inc.*

OIG Supplemental Compliance Program Guidance for Nursing Facilities, 73 Fed. Reg. 56832 (emphasis added).

**D.    Violations of the Anti-Kickback Statute Form the Basis of FCA Liability**

65.    Congress has long viewed the elimination of kickbacks as central to any efforts to combat Medicare fraud and abuse. *See United States v. Greber*, 760 F.2d 68, 70-71 (3d. Cir. 1985). Because kickback schemes negatively affect the integrity of federal health care programs, the United States has a strong interest in ensuring the continued viability of False Claims Act actions to deter and redress health care fraud predicated upon kickbacks. *United States ex rel. Charles Wilkins and Daryl Willis v. United Health Group, Inc. et al.*, (3d Cir. Oct. 2010)(No. 10-2747) (Brief for the United States as Amicus Curie Supporting Appellant)("Amicus Brief").

66.    To protect against the erosion of patient care and patient safety, courts uniformly agree that compliance with the AKS is a material condition of payment under the Medicare program. *See United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 243 (3d Cir. 2004); *United States ex rel. Conner v. Salina Regional Health Ctr.*, 543 F.3d 1211, 1223 n.8 (10th Cir. 2008); *United States ex rel. McNutt v. Haleyville Medical Supplies*, 423 F.3d 1256, 1259-1260 (11th Cir. 2005); and *United States v. Rogan*, 459 F. Supp. 2d 692, 717 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008).

67.    These and other courts have held that a person or entity who violates the AKS and submits a claim or causes another to do so has violated the False Claims Act regardless of what form the claim or statement takes. Many of these courts have reasoned that the claims are false, and thus violate the FCA, because there is a false certification – either express or implied – as to

68.    Compliance with the AKS each time a claim is submitted.[3]

69.    Moreover, the AKS was recently amended to expressly state what these courts had

[3] *See, e.g., United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir.1997); *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 245 (3d Cir. 2004); *Mason v. Medline Industries, Inc.*, 2010 WL 653542, at *5-9 (N.D. Ill. Feb. 18, 2010); *United States v. ex rel. Jamison v. McKesson Corp.*, 2009 WL 3176168 (N.D. Miss. September 29, 2009); *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 12, 17-18 (D. Mass. 2007); *United States ex rel. Bidani v. Lewis*, 264 F. Supp. 2d 612, 615-16; *United States ex rel. Franklin v. Parke-Davis*, 2003 WL 20048255 (D. Mass. August 22, 2003); *United States ex rel. Pogue v. Diabetes Treatment Centers of America*, 238 F. Supp. 2d 258, 264 (D.D.C. 2002); and *United States ex rel. Bartlett v. Tyrone Hospital, Inc.*, 234 F.R.D. 113, 121 (W.D. Pa. 2001).

1   already held, namely, that a violation of the AKS constitutes a "false or fraudulent" claim under

2   the FCA.  42 U.S.C. § 1320(a)-7b(g).

3          70.     Finally, in February, 2012, a federal court for the first time directly addressed

4   whether swapping in the nursing home context can form the basis for liability under the FCA.

5   *See United States ex rel. McDonough v. Symphony Diagnostic Services, Inc. et al.*, 2011 U.S.

6   Dist. LEXIS 153583 (S.D. Ohio 2012).   In denying the defendant's motion to dismiss, the

7   *McDonough* court held that the defendant's "agreements with [nursing homes] to provide free or

8   heavily discounted, below market x-ray services under Medicare Part A in exchange for exclusive

9   referrals for the [nursing homes'] Medicare Part B services states a claim for relief from

10  violations of the Anti-Kickback statute and the FCA." *Id.* at 23-24.  The same dynamic is present

11  in the instant case: the Defendants are providing heavily discounted, below market drug prices

12  under Medicare Part A in exchange for referrals of the nursing homes' Medicaid and Part D

13  business.

14          **E.     The California False Claims Act**

15          71.     The California False Claims Act, Cal. Govt. Code §§ 12650 *et seq.*, provides, *inter*

16  *alia*, that any person who (1) "knowingly presents or causes to be presented a false or fraudulent

17  claim for payment or approval" or (2) "knowingly makes, uses, or causes to be made or used, a

18  false record or statement material to a false or fraudulent claim," is liable to the State for a civil

19  monetary penalty plus treble damages.  Cal. Govt. Code §12651(a)(1), (a)(2).

20          72.     The term "'material' means having a natural tendency to influence, or be capable

21  of influencing, the payment or receipt of money, property or services."   Cal. Govt. Code

22  §12650(b)(4).

23          73.     The terms "'knowing' and 'knowingly' mean that a person, with respect to

24  information, does any of the following: (A) Has actual knowledge of the information. (B) Acts in

25  deliberate ignorance of the truth or falsity of the information.   (C) Acts in reckless disregard of

26  the truth or falsity of the information.  Proof of specific intent to defraud is not required.  Cal.

27  Govt. Code §12650(b)(3).

28

74.     The Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, contains substantially similar provisions to those cited above.

**F.      Federal and California Controlled Substance Law**

75.     The Federal Controlled Substances Act ("Federal CSA") provides in relevant part that "no controlled substance in schedule II, which is a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 301 et seq.], may be dispensed without the **written prescription of a practitioner**, except that in emergency situations, as prescribed by the Secretary by regulation after consultation with the Attorney General, such drug may be dispensed upon oral prescription in accordance with section 503(b) of that Act [21 U.S.C. 353(b)]." 21 U.S.C. Chapter 13, Subchapter I, Part C, § 829(a). Section 503(b) requires that such an oral prescription must be "**reduced promptly to writing** and filed by the pharmacist." (bold emphasis added)

76.     In addition, "no controlled substance in schedule III or IV, which is a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 301 et seq.], may be dispensed without a written or oral prescription in conformity with section 503(b) of that Act." 21 U.S.C. § 829(b).

77.     California law related to controlled substances provides that "[e]ach prescription for a controlled substance classified in Schedule II, III, IV, or V...shall meet the following requirements: (1) **The prescription shall be signed and dated by the prescriber in ink** and shall contain the prescriber's address and telephone number...and the name, quantity, strength, and directions for use of the controlled substance prescribed." Cal. Health & Safety Code § 11164. (bold emphasis added)

**VI.    SENIOR CARE SUBMITTED FALSE CLAIMS**

**A.      The Kickback Scheme: Swapping**

78.     The kickbacks alleged herein involve financial inducements to skilled nursing facilitates ("facilities" or "SNFs") on its Medicare Part A business in exchange for the revenue provided by its Medi-Cal and Medicare Part D business. The form of the inducement is 1) steeply discounted per diem rates, 2) steeply discounted prices for drugs, and 3) free drugs. In

20

UNDER SEAL FIRST AMENDED COMPLAINT - *U.S. et al. ex rel. Villamizar v. Senior Care Pharmacy, Inc.*

essence, Defendants were swapping their loss on the SNFs' Medicare Part A per diem business to gain the SNFs' full-price Medi-Cal and Medicare Part D business.

79.     Per Diem Pricing: As noted above, Part A patients make up a small percentage of the typical nursing home population; the vast majority of patients are covered by Medicaid and/or Part D.   In negotiations with nursing homes, Senior Care agreed with SNFs to provide prescription drugs to Medicare Part A residents at flat, highly discounted per day rates ("per diem rates"), in exchange for the full-price, market-driven rates paid by Medicaid (and, as of January 1, 2006, Medicare Part D).   Thus, Senior Care provided steep discounts for a small minority of patients, while charging full market price for the vast majority of the patient population.

80.     Discounted Pricing: Relator alleges that certain pricing agreements between Senior Care and SNFs included "carve out" provisions.   These clauses excepted out of the per diem arrangement a select group of particularly expensive products (e.g., Lovenox, Procrit, Epogen, etc.).   Such products were "carved out" from the per diem agreements and were to be paid for separately by the nursing home.   Senior Care supplied certain such excepted drugs for Medicare Part A per diem patients at SNFs and supplied the same exact drug to private health insurance patients at a far greater price.   Thus, the SNF was given a discount on the price of the medication as compare to other payors, which acts as a kickback in order to induce that SNF to send its other business, including Medi-Cal and Medicare Part D, to Senior Care.

81.     Free Drugs: In addition, Relator alleges that such carve out provisions were commonly "waived" by Defendant, i.e., the SNFs were not billed for, and thus did not have to pay for, the allegedly carved-out drugs.   When this occurred, the SNF received free drugs from Defendant, thus "sweetening" the already significant inducement provided by the per diem rates or the heavily discounted prices.

82.     Relator can testify that Senior Care provided pharmaceutical drug coverage to Medicare Part A residents for a highly discounted per diem fee ($15 per patient) and to provide free and reduced price drugs, *in exchange for* the opportunity to provide the same prescription drugs to the nursing home's other residents, including Medi-Cal and Medicare Part D patients. Senior Care could afford to provide nursing homes with steep discounts and free drugs because it

recouped its profits by being reimbursed by the government at significantly higher market-driven prices as to the remaining approximately 85% of the nursing homes' patients, including patients covered by Medi-Cal and Medicare Part D.

83. Relator can further testify that Senior Care was losing money by charging this per diem rate. Relator states that Senior Care would make up these losses on the much greater quantity of Medi-Cal and Medicare Part D patients; Senior Care used the prices charged to Medicare Part A patients as a "loss leaders." Relator alleges that had all the patients at the nursing homes that were offered per diems been Medicare Part A patients, and if Senior Care was charging the same per diem rates to all patients, Senior Care would not have been solvent. However, due to the "spillover" profit made from the approximately 85% of patients whose insurance was not offered discounted prices – including Medi-Cal and Medicare Part D – Senior Care remains a profitable and solvent company.

84. Senior Care services approximately 30- 40 long term care facilities and offers steeply discounted per diem rates to them. These long term care facilities are predominantly owned and operated by as single company, headed by Prema P. Thekkak. They include:

| Name of Nursing Home | Address |
|---|---|
| **Fairfield-serviced Facilities** | |
| Fircrest Rehabilitation Center | 7025 Corline Street Sebastopol, CA 95472 |
| Creekside – Creekside Convalescent Home a/k/a Creekside Care Center | 9107 Davis Road Stockton, CA 95209 and |
| Creekside Convalescent Hospital a/k/a Creekside Rehabilitation & Behavioral Health Facility | 850 Sonoma Avenue Santa Rosa, CA 95404 |
| La Mariposa Nursing & Rehabilitation Center | 1244 Travis Boulevard Fairfield, CA 94533 |
| Yuba Skilled Nursing Center | 521 Lorel Way Yuba City, CA 95991 |
| The Orchard Post Acute Care | 12385 E. Washington Boulevard Whittier, CA 90606 and 101 S. Orchard Street Vacaville, CA 95688 |
| Manteca Care and Rehabilitation Center | 410 Eastwood Avenue Manteca, CA 95336 |
| Corinthians Gardens Health Care Center | 1611 Height Street Bakersfield, CA 93305 |
| Martinez Convalescent Hospital | 4110 Alhambra Way Martinez, CA 94553 |

| | |
|---|---|
| Park Central Care & Rehabilitation Center a/k/a Park Central Skilled Nursing Facility | 2100 Parkside Drive Fremont, CA 94536 |
| Gateway Care & Rehabilitation Center | 26660 Patrick Avenue Hayward, CA 94544 |
| Baypoint Healthcare Center & Rehabilitation Center a/k/a Baypoint Healthcare Center Nursing Home | 422 Sunset Boulevard Hayward, CA 94541 |
| A&C Convalescent Hospital | 33 Mateo Avenue Millbrae, CA 94030-2037 |
| Hilltop Care Center | 3629 D Street Hayward, CA 94541 |
| Windsor Post Acute Care Center of Hayward | 25919 Gading Road Hayward, CA 94544 |
| **Garden Grove and Sun Valley-serviced Facilities** | |
| Stanley Health Care Center | 14102 Springdale Street Westminster, CA 92683 |
| Stone Bridge Manor | 44723 Stone Bridge Lane Lancaster, CA 92336 |
| Thousand Oaks Health Care Center | 93 W. Avenida De Los Arboles Thousand Oaks, CA 91360 |
| Valley Health Care Center | 1680 N. Waterman Avenue San Bernardino, CA 92404 |
| Van Nuys Health Care Center | 6835 Hazeltine Avenue Van Nuys, CA 91405 |
| Villa Elena Convalescent | 13226 Studebaker Road Norwalk, CA 90650 |
| Villa Maria Care Center | 723 East 9th Street Long Beach, CA 90813 |
| West Valley Health Care Center (new Garden Grove facility he believes) | 7057 Shoup Avenue West Hills, CA 91307 |
| Genesis NCS (Address comes up with Skylight Convalescent Hospital) | 1201 Walnut Avenue Long Beach, CA |
| Heritage Gardens | 25271 Barton Road Loma Linda, CA 92354 |
| Intercommunity Care Center | 2626 Grand Long Beach, CA |
| Lancaster Health Care Center | 1642 W. Avenue J Lancaster, CA |
| Mary Crest Manor | 10664 St. James Drive Culver city, CA |
| Mayflower Gardens | 6570 W Avenue L12 Quartz Hill, CA 93536 |
| Parkview Health Care Center (Parkview Convalescent?) | 1514 E. Lincoln Avenue Anaheim, CA 92805 |
| Regina Residence (Sisters of St Joseph of Orange) | 480 or 460 South Batavia Street Orange, CA |
| Western Health Care Center | 1700 East Washington Street Colton, CA 92324 |

85.     Moreover, Senior Care knew it was losing money on the Medicare Part A patients, and that it was making its profit back on the Part D and Medi-Cal patients.

86.     On March 21, 2014, Relator attended a work review meeting with Samit in the conference room of the Fairfield Pharmacy where Samit discussed Relator's future with the Company, including increased roles in the management and consulting pharmacy areas, and talked about a raise and Relator's work hours going forward. At that meeting, Samit described his business and said, "I barely scrape even on some patients. But we make money off the other patients, the Medi-Cal and [Medicare] Part D patients."

87.     In April 2014, Relator requested overtime pay, which request was denied. After Relator was absent from the work place due to a three-day weekend plus two contiguous sick days, Samit approached Relator on April 29, 2014, and said "We have to talk." Samit then escorted Relator into the conference room at the Fairfield pharmacy to discuss the back pay issue. During that conversation, Samit talked about his pharmacy business and stated that he could not afford overtime pay because he was suffering a loss on per diem patients, but that he makes a profit from the other patients that come with the per diem patients.

88.     In February 2014, Relator had a conversation in the Fairfield pharmacy with Ara Keusgarian, a supervisor at Senior Care in the Dispatch department, responsible for bagging medication, scanning the medication's bar code and sending it on to the SNFs, all after the pharmacist has initially checked it. Ara is a loyal, long term employee of Senior Care and has worked with Samit for over 10 years, often handling errands or personal tasks for Samit. Relator said to Ara that he thought Senior Care must be making a lot of money. Ara leaned in and quietly, so no one else in the pharmacy would hear him, said "I'm not supposed to say this, and don't tell anyone but we only charge 15$ per day on per diem patients." Relator replied "That's insane. Why would we do that? Who's getting the money on these meds?" Ara leaned in, put his finger to his mouth and whispered, "Shhh… we make money on the other patients."

89.     Senior Care and all of the SNFs it services have agreed that certain drugs supplied to Medicare Part A patients are excluded from the per diem arrangement. However, Senior Care often reduces the charge to the SNFs for excluded drugs for some Part A patients as compared to

24

UNDER SEAL FIRST AMENDED COMPLAINT - *U.S. et al. ex rel. Villamizar v. Senior Care Pharmacy, Inc.*

other Part A patients, and often supplies the excluded medication for a Part A patient at no charge at all. This is a direct benefit to the SNFs and further induces them to send all of its Medi-Cal and Part D business to Senior Care. For example, on April 26, 2014, a Symbicort inhaler, which is an excluded medication, was prescribed to a per diem patient insured by Manteca Medicare Part A. The prescription was filled at the Senior Care Fairfield facility. While the cost of the medication to Senior Care was $634.92, Senior Care billed the SNF [Manteca Care] only $190.83.

90.     On May 12, 2014, Senior Care supplied the excluded Pipercillin/Tazobactam 3.375 gram, 100 milliliter minibag to a Medicare Part A per diem patient at Baypoint Health Care for the price of $489.10, which cost Senior Care $182.92. This same exact drug was supplied to a private health insurance patient at Kern Rehab at a price of $609.52. Thus, Baypoint was given a discount on the retail price of the medication as compare to other payors, which acts as a kickback to induce that SNF to send its other business, including Medi-Cal and Medicare Part D, to Senior Care. In addition, this example shows that Senior Care did not charge its lowest price to certain SNFs, which price was passed on to DHCS.

91.     As discussed in detail above, Congress (through the AKS and the Code of Federal Regulations) and the OIG (through Fraud Alerts, Preamble Comments, Advisory Opinions, and Formal Program Guidances) have repeatedly stressed that "swapping" arrangements implicate the AKS, and further, are not protected by the discount safe harbor.

92.     The OIG Advisory Opinion issued on March 4, 1999 present here as in the federal government has determined the amount of money – in the form of a flat, daily rate – which is "appropriate and adequate" to cover the nursing homes' costs for providing care to Medicare Part A patients, including prescription drugs. Thus, when a nursing home accepts a Medicare Part A patient into its facility, the nursing home agrees to accept the flat rate as full payment. Senior Care, however, illegally provided nursing homes with additional remuneration in the form of below market discounts for Part A patients through subsidies paid for by Medi-Cal and Medicare Part D.

93.     The language of OIG Advisory Opinion 99-2 is directly applicable to this case. First, nursing homes "are in a position to direct a significant amount of business" to Senior Care

that is not covered under the bundled/PPS payment. Specifically, the vast majority of nursing home patients (approximately 85%) are not covered under the bundled/PPS payment, and instead are covered by full price payors, including Medicaid and Medicare Part D.

94.  Second, both the nursing homes and Senior Care "have obvious motives for agreeing to trade discounts on PPS business for referrals of non-PPS business: the [nursing homes] to minimize risk of losses under the PPS system," and Senior Care "to secure business in a highly competitive market." *Id.* [bracketing added]. This latter factor is particularly cogent here, where, as discussed above, the impetus for the kickbacks was the competitive institutional pharmacy market itself.

95.  In summary, Senior Care, motivated by greed and willing to break the law, engaged in a scheme by actively, opportunistically, and illegally offering kickbacks to nursing homes that were in a position to steer market share in Senior Care's direction.

96.  In addition, it is widely recognized that Part A patients are prescribed more medications than the average nursing home patient for a number of reasons, including that they typically have just been discharged from a hospital, post-surgery. Thus, in addition to any already-prescribed daily medications, Part A patients have greater need for pain medications, antibiotics to fight infection from the surgical wound, intravenous fluids, anti-coagulants to prevent blood clots, anesthesia drugs, and so on.

97.  Indeed, Senior Care was losing money at these prices. Given the amount of drugs being taken by each patient, and the rising cost of drugs overall, how can a pharmacy make money by providing drugs to nursing home patients for $15/day? The answer is, it can't. However, Senior Care can and does make money via the full-price "pull through" business provided by Medicaid and Medicare Part D.

98.  On March 21, 2014. Samit told Relator that he purchased and now owns two SNFs, which Prema Thekkak manages. Upon information and belief, Senior Care is the pharmacist for those two SNFs and Prema Thekkak is the manager and operator.

**B.    Switching Drugs**

**(1)  Switching to a Non-bioequivalent Form of the Same Drug**

26

UNDER SEAL FIRST AMENDED COMPLAINT - *U.S. et al. ex rel. Villamizar v. Senior Care Pharmacy, Inc.*

99.     The Company is switching non-bioequivalent forms of drugs (between capsules, pills, liquids and solids) so that it is dispensing a different form of the prescribed drug that has the widest margins and offers the Company the greatest amount of profit. Samit specifically told Relator that Senior Care can legally switch between forms of a drug because it is a long-term care pharmacy.

100.     Different dosage forms of the same drug are not bioequivalent. According to the FDA:

> Pharmaceutical Equivalents. Drug products are considered pharmaceutical equivalents if they contain the same active ingredient(s), **are of the same dosage form**[4], route of administration and are identical in strength or concentration (e.g., chlordiazepoxide hydrochloride, 5mg capsules). Pharmaceutically equivalent drug products are formulated to contain the same amount of active ingredient in the same dosage form and to meet the same or compendial or other applicable standards (i.e., strength, quality, purity, and identity), but they may differ in characteristics such as shape, scoring configuration, release mechanisms, packaging, excipients (including colors, flavors, preservatives), expiration time, and, within certain limits, labeling.
> Pharmaceutical Alternatives. Drug products are considered pharmaceutical alternatives if they contain the same therapeutic moiety, but are different salts, esters, or complexes of that moiety, or are different dosage forms or strengths (e.g., tetracycline hydrochloride, 250mg capsules vs. tetracycline phosphate complex, 250mg capsules; quinidine sulfate, 200mg tablets vs. quinidine sulfate, 200mg capsules). **Data are generally not available for FDA to make the determination of tablet to capsule bioequivalence**. Different dosage forms and strengths within a product line by a single manufacturer are thus pharmaceutical alternatives, as are extended-release products when compared with immediate-release or standard-release formulations of the same active ingredient.
> Therapeutic Equivalents. Drug products are considered to be therapeutic equivalents only if they are pharmaceutical equivalents and if they can be expected to have the same clinical effect and safety profile when administered to patients under the conditions specified in the labeling.[5]

101.     Samit told Relator on multiple occasions at Fairfield that "we switch dosage forms based on profitability." He said, "we make more money on this one. This one's cheaper." The Data Entry department at Senior Care is trained to choose the cheapest form of the drug and switch automatically, which is necessarily not bioequivalent because it is a different form of the drug.

102.     For example, at Senior Care, orders for Vancomycin oral capsules are always

---

[4] The dosage form is the physical form of a dose of drug. Common dosage forms include tablets, capsules, creams, ointments, liquids, aerosols and patches. Each dosage form may also have a number of specialized forms such as extended-release, buccal, dispersible and chewable tablets.
[5] http://www.fda.gov/ohrms/dockets/ac/05/briefing/2005-4137B1_07_Nomenclature.pdf (bold emphasis added)

automatically filled as an oral vancomycin solution, which is compounded and packaged by the pharmacy. The Fairfield pharmacy has never stocked Vancomycin capsules since Relator has worked there because they are expensive - roughly $18/capsule as listed on the supplier's (Mckesson) website, as opposed to the much cheaper compounded oral solution. No new doctor's order was obtained for this switch.

103.    On May 28, 2014, prescription # 26076383 for a patient at Manteca Care and Rehab was written for a 20 mg powder packet of potassium. The Senior Care Fairfield pharmacy technician filled this prescription in the form of the more expensive extended release tablet. Relator specifically held this prescription back, since there was no doctor approval for the change in form of the medication.  The Data Entry technician argued that "we are allowed to switch to tablets." Relator suggested asking Samit since he was working directly across from the Relator at the pharmacist computer station. Samit stated that it was acceptable to switch the form without doctor approval and the prescription was then sent to the SNF. He also stated not to switch to the liquid because the liquid form of Potassium Chloride "is not cheap anymore," referencing a pricing increase.

104.    Switching from a prescribed form of a certain drug to a non-bioequivalent form of the same drug results in overcharging the federal government and the State of California, in violation of the Federal and California False Claims Acts.  By switching to a more expensive form of the same drug, which was more profitable to Senior Care, Medicare and Medi-Cal were billed and subsequently paid higher amounts than they otherwise would have paid had Defendants not switched the form of the drug.

### (2)  Switching to a Different Drug Based on Cost

105.    There is an FDA resource called the Orange Book that lists approved drug products with therapeutic equivalence evaluations.  This book indicates exactly which drugs the FDA considers to be bioequivalent. Senior Care pharmacies do not have an Orange Book. Instead, each Senior Care pharmacy has an online subscription to the "Facts and Comparisons" pharmacy program resource, which does not contain bioequivalence information.  No other

resources or references were made available or otherwise provided to pharmacists or pharmacy staff that could assist them in deciding which specific drug to dispense based on an order.

106.    When a new patient (called an "admit") is admitted into a SNF serviced by a Senior Care pharmacy, the patient's list of medications is sent to the pharmacy. If the medication required is expensive, Data Entry or managers like Tony Nguyen will, to be on the safe side, assume the patient is a per diem patient and immediately try to have the medication switched to a less expensive drug or call the facility to see if the medication is necessary at all or if the Director of Nursing will approve it for payment as an exception to the per diem.  Because the pharmacy at that point in time does not know the name of the patient's insurance provider, it will send only a short five day supply of any required expensive medications to the SNF to be administered to the patient.  When Senior Care becomes certain of the insurance carrier, it then processes the remainder of the order.  If the patient is a per diem patient, Senior Care will try to change the medication to a cheaper alternative (through the use of a Noncovered Drug (NCD) form, as discussed below) if it hasn't already done so and will send out only small quantities upon the request of the facility.  If the medication can somehow be billed outside of the per diem arrangement or if the insurance turns out to be Medi-Cal or Part D, the pharmacy technician, non-pharmacist manager or a worker in Senior Care's India office, where the Company does billing, insurance processing and data entry, will suggest a different medication that is in the same class of drugs as the prescribed medication or a, but one that will yield the Company more profits because the margins on the drug are greater.  For those non-per diem patients, medication is continued until it is requested to be discontinued, and Senior Care will choose the actual dosage form based on profitability.

107.    For per diem patients, to get the provider to agree to switch to a different drug, Senior Care pharmacy technicians fill out a Noncovered Drug (NCD) form which indicates to the prescribing physician that it is acceptable to substitute the new medication. This form is then sent to the Senior Care pharmacist to confirm that the drugs provide a therapeutically similar outcome, and then sent to the prescribing physician. The form falsely states that the drug originally prescribed "is not covered by resident's insurance" when it is.  In addition, Relator was trained by

29

UNDER SEAL FIRST AMENDED COMPLAINT - *U.S. et al. ex rel. Villamizar v. Senior Care Pharmacy, Inc.*

Samit and other company pharmacists to further tell the physician directly by telephone that the previously prescribed medication is not covered by the patient's insurance. Thus, the doctor is led to believe that the switch in medication is required to be covered by the patient's insurance. In fact, the original drug prescribed is covered under the Medicare Part A per diem payment and the switch is being fraudulently pushed by the Company to maximize its own profits.

108.    In an email dated May 12, 2014 from Senior Care manager Cecillia Ou to Fairfield managers and pharmacy technicians, Ms. Ou wrote with respect to a prescription for Invokana 100 mg Tablet, "Can we change this to something else. Expensive med for a skilled pt."

109.    To further facilitate switching to cheaper or more profitable medications, Senior Care maintains at each pharmacy location a "Preferred Drug List" that lists Preferred Drugs that should be used in lieu of Non Preferred Drugs.  In an email dated May 21, 2014 from Lindsey Mai that cc's Fairfield managers and pharmacists, she asks "Can we please get this med changed to Exelon capsules or Aricept per preferred drug list?"

110.    For example, a Noncovered Drug (NCD) form regarding prescription # 26095883 sent to Dr. Sunil Desai at the Baypoint facility for Namenda 10 mg states that Namenda 10 mg "is not covered by the resident's insurance" and lists as alternatives for the physician to approve, including Exelon Capsules and Aricept, two medications that, upon information and belief, are more profitable for the Company to prescribe.

111.    In supplying therapeutically similar but higher priced drugs that yield greater margins, Senior Care is overcharging the federal government and the State of California, in violation of the Federal and California False Claims Acts.  As a result, Medicare and Medi-Cal subsequently pay higher amounts to Senior Care than they otherwise would have paid had Defendants not switched the medication.

### C. Restocking Returned Medication and Re-Billing the Government

112.    According to FDA Compliance Policy Guides Sec. 460.300 Return of Unused Prescription Drugs to Pharmacy Stock (CPG 7132.09):

> **A pharmacist should not return drugs products to his stock once they have been out of his possession**. It could be a dangerous practice for pharmacists to accept and return to

stock the unused portions of prescriptions that are returned by patrons, because he would no longer have any assurance of the strength, quality, purity or identity of the articles. Many state boards of pharmacy have issued regulations specifically forbidding the practice. We endorse the actions of these State boards as being in the interest of public health.

The pharmacist or doctor dispensing a drug is legally responsible for all hazards of contamination or adulteration that may arise, should he mix returned portions of drugs to his shelf stocks. Some of our investigations in the past have shown that drugs returned by patrons and subsequently resold by the pharmacist were responsible for injuries.[6]

113.    Thus, open blister packs of any medication are required to be destroyed and no medication may be removed from blister packs and be restocked.

114.    With regard to controlled substances, the Controlled Substances Act, 21 U.S.C. § 801 et seq., requires every registrant who manufactures, distributes, or dispenses a controlled substance or substances to maintain, on a current basis, a complete and accurate record of each such substance manufactured, received, sold, delivered, or otherwise disposed of by the registrant (21 U.S.C. 827(a)(3)). Records must contain such information as the Attorney General requires to be kept by regulation (21 U.S.C. 827(b)(1)).

115.    Senior Care receives returns from the SNFs to which is supplies pharmaceuticals, restocks those medications (including C2s), redispenses them after it receives a new prescription for them and then bills the government. Thus, in addition to the illegality of restocking and reutilizing previously dispensed medication, Senior Care bills the government twice for the exact same medication.

116.    Relator on a daily basis has seen Senior Care employees at the Fairfield pharmacy restocking medications that were returned from the SNFs. When supplying medication initially, the pharmacy takes pills or capsules out of large properly marked jars and packs them into drug blister packs where each pill or capsule is separately heat sealed on the same blister pack into a plastic covering. When partially used blister packs are returned, several pills remain in their sealed plastic covering. These pills are punched out of the blister packs, restocked and resold by the pharmacy.

117.    Almost daily for the first eight or nine months that Relator worked at the Fairfield pharmacy, he saw pharmacy technicians popping the pills and capsules out of returned, partially

[6]http://www.fda.gov/ICECI/ComplianceManuals/CompliancePolicyGuidanceManual/ucm074399 .htm

used drug blister packs. These drugs were then returned to the pharmacy's bottle containing the same medication. The pharmacist would first check to make sure that the returned drugs were not expired and that they were the same NDC (National Drug Code number) of the drugs in the bottles before allowing them to be placed back in the bottle. Entirely unused drug blister packs were simply put back on the shelf.

118. Relator has also seen Samit's wife and Prema Thekkak's nephew (Fred) sorting through garbage bags full of returned medication in order to reclaim and restock those drugs. On April 29, 2014, Relator took his break at 7:25 and saw Samit's wife sorting through numerous garbage bags of returned medication in the conference room, and also saw Fred going through garbage bags full of returns in the room beside the lunch room, which was the room that typically housed return medications. Relator took pictures of the returned medication on site.

119. Before one visit to the Fairfield pharmacy by the California Board of Pharmacy in January, 2014, Samit had all of the bags full of returned medication hidden in Fairfield pharmacy manager Tony Nguyen's garage and then returned to the site after the Board of Pharmacy finished its site visit.

120. Relator was told on May 13, 2014, by JC, the female head driver at Fairfield, that medication that is returned to the pharmacy on the same day that it is delivered is specifically logged in with the correct prescription number. This means that she writes down the prescription number for same day returns which the pharmacist then signs. These are usually medications that were supplied in error and were never given to the patient (because the patient died, use of the medication was discontinued or the patient was discharged). All other returns come back in large, clear garbage bags. Often, these are medications that were prescribed weeks or months prior. For these, according to JC, the Senior Care drivers do not go through those bags to examine the drugs and write down the prescription numbers. Such medications included controlled substances, including Schedule II Controlled Substances[7], which are in the custody and control of the drivers without being properly and lawfully tracked.[8]

---

[7] Schedule II (C2) Substances: The controlled substances in this schedule have a high abuse potential with severe psychological or physical dependence liability, but have accepted medical use in the U.S. C2 controlled substances consist of certain narcotic, stimulant, and depressant drugs. Some examples of C2 narcotics are: opium, morphine, codeine, hydromorphone

32

UNDER SEAL FIRST AMENDED COMPLAINT - *U.S. et al. ex rel. Villamizar v. Senior Care Pharmacy, Inc.*

121.    Relator confirmed in a telephone call with a nurse Linda from the Creek Side SNF on May 16, 2014, that unused medications are retrieved by Senior Care employees.

122.    On May 15, 2014, Relator observed a bin containing medication returns in the Fairfield warehouse at 8:05 am and took a picture. There were numerous packets containing returned blister cards that were rubber banded together. Each packet of multiple cards was sorted by patient name and contained the returned medication blister cards for that particular patient – either all the same medication or multiple medications. Wrapped around each packet of blister cards was a sheet with the prescription numbers written and containing the prescription stickers pulled off of the medication labels. For example, he saw a packet of 5 unfinished blisterpack cards each of Ibuprofen for one patient and Tramadol for another. For a different patient, he saw nine returned potassium blister cards. Upon information and belief, these medications were unlawfully restocked and then resold.

123.    During the months of October and November, 2013, Relator specifically observed controlled drugs (C3 through C5) being restocked at the Fairfield pharmacy.

124.    The Controlled Substances Act, 21 U.S.C. § 801 et seq., requires all pharmacies to keep a perpetual inventory in a log book that accounts for every single Schedule II (C2) controlled substance down to a single pill or milliliter, including oxycontin, dilaudid, fentanyl and oxycodone. Every time the pharmacy receives a delivery of a C2, it has to be logged into the corresponding inventory book by a pharmacist, signed with the running quantity totals and indicating the quantity added. When a C2 prescription is dispensed, the prescription number, patient name, facility, amount dispensed and running total of the drug has to be hand written in the log and signed off by the pharmacist. Thus, C2s cannot be slipped back into the inventory without a pharmacist becoming aware when he or she does a physical count.

125.    On April 29, 2014, Relator observed Fairfield pharmacist Mai Tran restocking a

---

(Dilaudid)1, methadone, meperidine (Demerol), cocaine, oxycodone (Percodan), anileridine (Lertine), the immediate precursor phenylacetone (P-2-P), and oxymorphine (Numorphan). Also in C2 are the stimulants amphetamine (Dexedrine), methamphetamine (Desoxyn), phenmetrazine (Preludine), and methylphenidate (Ritalin); the depressants amobarbital, pentobarbital, secobarbital; and fentanyl (Sublimaze), etorphine hydrochloride, and phencyclidine (PCP).

[8] Relator cannot be sure that these C2s are not being unlawfully diverted.

number of C2s and then entering into the corresponding required medication logbook the restocked amount followed by the word "Return" in lieu of a patient name. For example, she simply wrote on page 43 of the "Morphine Sulfate ER 30mg" log book the date, the word "Return" and the number 22, which was the quantity restocked. Although DEA regulations require an inventory of C2s regularly and that each pill be accounted for in the log book, C2s, like all other medications, cannot be restocked, even if the restocking is properly accounted for in the log book.

126. An unrelated email from Samit to all Fairfield employees, dated 4/30/2014 and titled "corrections to the C2 binder," attached a screenshot of log book page 72 showing an entry of "+14" pills of hydromorphone 2mg that was marked "Returns", evidencing that Samit was well aware of returns. Relator also saw prescriptions and portions of the patient labels that were ripped off from the packaging that contained returned medication, including from returns of: Hydrocon-APAP 5/325, RX# 24009796 03/26/14; Morphine Sulf ER 30mg TA, RX#22007657 03/17/14; and Nevarez Oxycodone 10mg. Relator visually saw the following medications being returned to the control medication cabinet by Mai Tran: RX# 24010033 4/3/14, Hydrocodone 5/325MG; and RX# 24010066 4/4/14, Lorazepam 2mg.

127. C2s that had been punched out of returned blister packs were restocked into bottles that already contained different lots of the same medication. This means that drugs of different expiration dates and different lot numbers were now all commingled in the same bottle. These drugs would then be resold, with misleading expiration dates and lot numbers on their new labels.

128. When a pharmacy technician could not find a bottle with the same medication she was attempting to restock, the technician would place the drugs that had been popped out of the returned blister packs into separate vials that she then labeled with an incorrect expiration date and lot number. Drugs from these vials, just as other restocked medication, were also illegally resold by the pharmacy and billed to government payors.

129. Beginning May, 2014, pharmacy technicians were no longer retrieving and restocking returned medications themselves. Samit hired an employee named Ariel specifically to pop the drugs out of the returned drug blister packs. This new employee was initially kept

separate and hidden from the rest of the Fairfield employees. Relator believes Samit hired a new employee for this purpose because he had seen other qui tam lawsuits that addressed this conduct and was concerned about someone reporting this activity.

130. Checking and restocking returned prescriptions, including C2s, was a regularly accepted practice at all Senior Care pharmacies and was explicitly listed on Pharmacist Daily Responsibilities checklists. In an email dated December 24, 2013 from Samit to all Senior Care pharmacists, he specifically stated, when listing pharmacist duties and the amount of time each duty should take, that "Drug return checks" should take one minute.

131. Relator has been presented by a pharmacy technician with restocked medication to then redispense, including insulin on May 30, 2014. Relator has seen Epogen, which must be refrigerated, sit in the room temperature storage room before it was restocked. Further, it was entirely unknown if this Epogen had been refrigerated at the SNF after it was originally dispensed. The pharmacy technicians were told by the Fairfield pharmacy manager Tony Nguyen to dispense all of the returned medication first.

**D. Billing Medi-Cal Without The Most Favorable Rates**

132. Senior Care did not give Medi-Cal its most favorable rates. For two separate prescriptions to two different patients at Kern Rehab for Lantus 100 Units/ml Vial, Senior Care charged Kern Rehab $211.28 for the Medicare Part A per diem patient and charged Medi-Cal $410.20 for the Medicaid patient.[9]

133. Senior Care is also partial filling prescriptions and billing Medicare for the full amount, sending un-requested prescriptions to the SNFs and billing for them, and billing Medicare for medications dispensed for patients who have been discharged. For example, on June 11, 2014 a Senior Care driver handed Relator a returned medication bottle and stated that the nurse at the facility said that the patient for whom the medication had apparently been prescribed

[9] In addition to charging Medical more than it charged other payers, Relator has evidence that Senior Care billed MediCal exorbitant mark ups for medication it dispensed. For a prescription written on February 28, 2014 to a patient at Kern Rehab for Zofran 8 MG Tablet, Senior Care's cost was $2.24, while it charged MediCal $1,019.67, reflecting a 45,000% mark up. Similarly, For Lovenox 40 MG/0,4 ML Syringe, Senior Care's cost is $114.10. When it dispensed this medication to a patient at Baypoint Health Care in February 2014, it charged Medi-Cal $1,397.65, reflecting a 1124 % mark up. While these "mark-up" examples do not constitute fraud per se, they reflect the company's state of mind with respect to billing government payers.

had been discharged months earlier and Senior Care had recently dispensed this refill on June 10, 2014 out of the blue. A note in the patient's profile stated that it was ok to bill Medicare for the medication and send it on June 10th. The patient had not previously been sent this medication since April 2014.

**E.    Dispensing C2s Improperly**

134.    Federal regulations require prescriptions for C2s to be made in writing and signed by a DEA registered practitioner. If the prescribing practitioner determines that the situation is an emergency, a pharmacist may dispense a C2 after receiving oral authorization from the DEA registered practitioner. 21 CFR § 1306.11(d). The practitioner must then provide a pharmacist with a written prescription within 7 days after issuing the oral prescription. 21 CFR § 1306.11(d)(4).[10]

135.    Senior Care dispensed C2 medications without the required authorizations. Senior Care pharmacies would receive a written faxed order from a SNF for a C2 that was not signed by a DEA registered practitioner, and dispense the medication without obtaining the required verbal approval to dispense the C2 on an emergency basis. Samit verbally approved and encouraged this process and allowed pharmacists to dispense with an unsigned order and on an emergency basis without a verbal authorization. After an unsigned order was received, he allowed that order to be filled and the signature and verbal authorization obtained the next day. In the Fall 2013, Samit said to Relator and in an email that patients could not be denied medications they needed and suggested a cut off time of 10 pm to obtain a doctor's verbal validation for an unsigned C2 order – if it was after that time, the medications could be sent and the verbal authorization obtained from the doctor the next day, which did not always occur. This violates the express requirement that a before a medication can be dispensed, the pharmacy must receive either a signed order or a verbal authorization for an emergency fill. Upon information and belief, this was the procedure at every Senior Care pharmacy.

136.    After an initial signed written order from a facility for a C2 is received (or the required verbal authorization is received for an emergency prescription and noted by a

---

[10] *See* DEA letter dated August 6, 2009,; https://www.ascp.com/sites/default/files/8-6-2009DearPractitionerLetter.pdf

36

UNDER SEAL FIRST AMENDED COMPLAINT - *U.S. et al. ex rel. Villamizar v. Senior Care Pharmacy, Inc.*

pharmacist), a Senior Care pharmacy dispenses up to a 7 day supply in accordance with 21 CFR § 1306.14(c)(1). The pharmacy then faxes three forms to the actual doctor or other authorizing DEA registered practitioner for his or her signature – a form for the initial 7 day order and a form for each of two consecutive 30 day refills (referred to as continuation forms by Senior Care). If after a week, the pharmacy only has a verbal authorization or a signed form for the initial 7 day supply and not for any refills, it often dispenses the refills anyway. This was common practice at Fairfield through 2013 and violates 21 CFR § 1306.11. These unauthorized refills resulted in false claims for payment presented to the government.

137. An emergency C2 Kit is retained at each facility, which was locked and required a code to open. *See* 45 FR 24128 April 9, 1980. These narcotics E-Kits are to be used, per DEA regulations, in emergency situations, only once for any given prescription and only as part of a patient's initial narcotics prescription – never a refill. When a patient at a facility was in need of a refill C2 (i.e. if the patient at a facility ran out of narcotic medication and still needed it), instead of waiting to receive a properly signed continuation order from the facility, Senior Care pharmacies would simply give the facility the code to access the Emergency C2 Kit. In addition to being illegal, this further acted as an inducement for the facility to send all of its other prescription business to Senior Care.

138. Furthermore, non-pharmacists at Senior Care would at times give out the E-Kit code to the facility after supposedly receiving a verbal approval from a doctor. In one email, a non-pharmacist manager (Tony Nguyen) described getting a doctor's verbal approval and then authorizing to the facility to get the C2 from the C2 E-Kit. This is an invalid order and breach of DEA regulations since 1) it was not reviewed or approved by a pharmacist, 2) the code wasn't given by a pharmacist and 3) the verbal approval was not obtained by a pharmacist.

139. In addition to an emergency C2 Kit, each facility also maintains an emergency kit for oral medications ("PO Kit"), which contain both narcotics [C3-C5 (not C2s)] and non-narcotic medications, which is not locked and does not require a code to access. When this PO Kit is used, the SNF nurses are required to fill out required paperwork in the E-Kit and return it with the E-Kit to the pharmacy. Senior Care allowed facilities to use the C3-C5 narcotics in the PO

Emergency Kit without supervision or controls or the required paperwork. At Kern Rehab (aka Corinthian Garden) in Bakersfield, Kern County, CA, Senior Care's Fairfield pharmacy cycled through four Emergency PO Kits each day. Four new such kits would be exchanged for four old kits each day. These PO E-Kits came back to Fairfield empty of every narcotic every day for approximately several months in the beginning of 2014 without explanation. To Relator's knowledge, this activity was never reported to the DEA, a further inducement for the facility to keep its contract for all of its other prescriptions with Senior Care.

140. After an initial written order from a facility or verbal order from a provider for a C2 is received, a Senior Care pharmacy can then dispense up to a 7 day supply. The pharmacy then sends three forms, which are prefilled templates only missing the practitioner's signature, to the doctor to sign – a form for the initial 7 day order and a continuation form for each of two consecutive 30 day refills. The continuation forms for each of the two refills were sent to the doctor at the same time as the initial form and with the signature date filled in. Thus, when the doctor signed them, the signature dates were not in his or her own handwriting, in violation of Cal. Health & Safety Code § 11164. Further, those signature dates on the refill orders were dated weeks or months later, so it would appear that the doctor signed them at or around the dates those refill medications were to be dispensed, when in fact she signed them on the same date she signed the form for the initial 7 day order. At Senior Care pharmacies, these refill orders were inputted into the computer system as being written on the pre-filled out dates, and not the dates they were actually signed. The C2 coordinators are specifically trained by Samit and Tony Nguyen and not staff pharmacists on how to process, prepare and send these forms and are responsible for receiving and sorting through the forms when they are faxed back to the pharmacy from practitioners and inputting them into the pharmacy computer system, using the prefilled dates. These C2 coordinators do not have any prior training or understanding of pharmacy law for C2's outside of what they are told by Samit and Tony, and often are instructed to go to a non-pharmacist manager or Samit rather than a staff pharmacist with questions or concerns

141. For example, Senior Care sent an order form for a patient at Kern Rehab for Morphine 100MG/5ML with the physician's signature date pre-filled in with the date of May 29,

38

UNDER SEAL FIRST AMENDED COMPLAINT - *U.S. et al. ex rel. Villamizar v. Senior Care Pharmacy, Inc.*

2014. Senior Care sent a continuation form for a refill of the same drug for the same patient at the same time, with a physician's signature date pre-filled in with the future date of June 12, 2014. Both forms were signed by the Kern physician and faxed back to the Senior Care Fairfield pharmacy on May 29, 2014, as evidenced by the fax header. For another example, a patient at Creekside received RX#22009042 for Oxycodone 10mg on form 5000000B. This order form was pre-dated as of 5/20/2014 but had a fax header showing it was sent to Senior Care on 05/07/2014 from Dr. Matalon Eran's office. Fairfield pharmacy dispensed 56 tabs pursuant to this prescription on 5/31/2014.

142.     Frequently, multiple refill order forms were sent to the doctor for his signature, so that he would unknowingly sign and fax back more refills than were required, which allowed Senior Care to dispense and bill for extra and unnecessary medication, receive back from the SNFs more unused medication which it could then restock and redispense, and bill the government twice for the same medication. Samit sent an email to Fairfield employees stating that a doctor complained to the DEA that Senior Care had sent multiple faxes for the same prescription and that the doctor suspected Senior Care was looking to divert drugs. Samit admonished that for this doctor, no verbal orders from him would be accepted and no order forms would be generated from Senior Care and sent to him for his signature. That doctor was thereafter required to generate and send his own triplicate order form, and prescriptions for C3s through C5s had to be on his own prescription pad.

## VII.    FALSE CLAIMS

143.     Compliance with the federal AKS is a precondition to payment from all state Medicaid programs, including Medi-Cal.

144.     Senior Care entered into contracts with Medicare Part D sponsors that contain language obligating them to comply with all applicable federal laws, regulations, and CMS instructions. 42 C.F.R. § 423.505(i)(4)(iv). Compliance with the federal AKS is a precondition to payment from Medicare Part D and other federal payors.

145.     As detailed above, Senior Care entered into Medicare Part A kickback arrangements with nursing homes. These contracts violate the AKS, and no safe harbor applies.

1    Through these contracts, Senior Care submitted or caused to be submitted claims for

2    reimbursement to Medi-Cal and to various federal government health care programs including

3    Medicare and TRICARE. Each of these claims was accompanied by an express or implied

4    certification that the transaction was not in violation of federal or state statutes, regulations, or

5    program rules. Each of those certifications was false, because each claim for payment was tainted

6    by the kickback arrangement detailed in this Complaint. Given the more than 20 years of

7    statutory and regulatory guidance with respecting to such illegal "swapping" arrangements,

8    Senior Care – an experienced health care provider with detailed knowledge of the laws applicable

9    to government programs – knew that the claims were tainted by the kickback scheme, and thus

10    were not reimbursable by government programs such as Medi-Cal or Medicare Part D. *See U.S.*

11    *ex rel. Gale v. Omnicare, Inc.*, 1:10CV127, 2012 WL 4473265 (N.D. Ohio Sept. 26, 2012) ("In

12    light of these, and other lengthy recitals in the pleading, the Court is satisfied that Relator has

13    satisfactorily alleged that Omnicare paid remuneration to SNF's; that there is a connection

14    between the alleged remuneration and the referral of federally-reimbursed business to Omnicare;

15    and that Omnicare acted with the requisite intent.") Knowingly submitting or causing the

16    submission of claims for prescription drugs which are not reimbursable creates liability under the

17    Federal and California FCAs.[11] Thus, each of these claims to the government from Senior Care

18    constituted a violation of section 3729 of the FCA.

19    **VIII.**    <u>**ADDITIONAL FALSE CLAIMS AS TO THE STATE OF CALIFORNIA**</u>

20          146.    The California False Claims Act, codified in the California Government Code

21    sections 12650, *et seq.*, states that it is a violation to: (a) Knowingly present or cause to be

22    presented false claims for payment or approval of claims for Medi-Cal reimbursement; and/or, (b)

23

---

24    [11] Knowingly causing the submission of claims that are ineligible for payment under a federal
healthcare program constitutes a violation of the FCA. *See U.S. ex. rel. Franklin v. Parke-Davis*,

25    147 F. Supp. 147, 152-153 (D. Mass. 2001); *See also U.S. ex rel. Nowak v. Medtronic, Inc.,* Case
Nos. 1:08-cv-10368 and 09-cv-11625, D. Mass. (United States of America's Statement of

26    Interest, at 6)("[t]o the extent that a healthcare provider seeks reimbursement for a procedure that
is ineligible for payment under a federal healthcare program . . . because the program places other

27    conditions on coverage that are not satisfied, the claim is false"), and *U. S. v. Medco Physicians
Unlimited*, 2000 U.S. Dist. LEXIS 5843, at *27 (N.D. Ill. Mar. 15, 2000) (granting partial

28    summary judgment for plaintiff on the issue of liability with respect to its claim that Medco
submitted false claims for non-reimbursable meals and transportation costs.)

Knowingly make, use, or cause to be made or used false records or statements to get false claims paid or approved by California for Medi-Cal reimbursement.

147. Under Title 22, Section 51501, subdivision (a) of the California Code of Regulations, "no provider shall charge for any service or any article more than would have been charged for the same service or article to other purchasers of comparable services or articles under comparable circumstances" (the "Comparative Pricing Rule").

148. California also has prohibitions with respect to the exchange of remuneration and Medi-Cal program business. Specifically, under the Business and Professions Code, it is prohibited to offer or accept "any rebate, refund, . . . discount or other consideration, whether in the form of money or otherwise, as compensation or inducement for referring patients, clients, or customers." California Business and Professions Code §650. Similarly, all Medi-Cal providers, including institutional pharmacies, are prohibited from soliciting or receiving "any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in valuable consideration of any kind . . . in return for the referral . . . of any person for the furnishing . . . of any service" paid for by Medi-Cal. California Welfare and Institutions Code §14107.2.

149. During the time period relevant to this complaint, Senior Care had swapping arrangements with nursing homes throughout California. Under these arrangements, discounted per-diem rates were given to the nursing homes at the same time that Medi-Cal was being billed at the non-discounted prices for the same drugs; despite the fact that Medi-Cal and the nursing homes were purchasers of comparable services under comparable circumstances. Accordingly, each claim submitted by the Defendant to Medi-Cal was in violation of the Comparative Pricing Rule, the Business and Professions Code, and the Welfare and Institutions Code.

150. In submitting claims for payment to Medi-Cal, Senior Care certified that its services complied with California statutes and regulations. Those certifications were false, in that the institutional pharmacies were in fact charging far lower fees to other purchasers of comparable services under comparable circumstances, and because the deep discounts were prohibited remuneration in exchange for Medi-Cal business.

1    151.    Consequently, each claim for payment was a false claim in violation of

2    California's False Claims Act (Gov. Code § 12650 *et seq.*).

3    **IV.   COUNTS**

4                                                **COUNT I**
                                   **FEDERAL FALSE CLAIMS ACT**
5                                    **31 U.S.C. §§ 3729(A)(1)(A)**
     **(Defendants Senior Care Pharmacy Services Inc. And Samitendu Banerjee)**
6

7    152.    Relator re-alleges and incorporates by reference all of the preceding paragraphs of

8    this Complaint as if fully set forth herein.

9    153.    Senior Care knowingly and willingly offered illegal inducements to nursing homes

10   in the form of deeply discounted prescription drug prices in exchange for the opportunity to

11   provide prescription drugs services to the nursing homes' Medi-Cal and/or Medicare Part D

12   patients.

13   154.    Subsequently, Senior Care submitted or caused to be submitted claims for payment

14   to Medi-Cal and Medicare Part D plans.  Each of these claims – which were paid in whole or in

15   part with federal funds – was accompanied by an express or implied certification that the

16   underlying transaction was not in violation of federal or state statutes, regulations, or program

17   rules, including the federal Anti-Kickback Statute and the OIG preamble comments, advisory

18   opinions, and formal guidance.  Each of those certifications by Senior Care was false, because

19   each claim for payment was tainted by the kickback/swapping arrangement described in this

20   complaint.  Accordingly, Senior Care knowingly presented, or caused to be presented, false and

21   fraudulent claims for payment or approval to the United States in violation of 31 U.S.C. §

22   3729(a)(1)(A).

23   155.    Because of Senior Care's conduct set forth in this Count, the United States is

24   entitled to recover treble damages plus a penalty for each false and fraudulent claim.

25                                              **COUNT II**
                                   **FEDERAL FALSE CLAIMS ACT**
26                                    **31 U.S.C. §3729(A)(1)(B)**
     **(Defendants Senior Care Pharmacy Services Inc. And Samitendu Banerjee)**
27

28

156.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

157.     Defendant Senior Care knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the United States Government. Defendant Senior Care's false records or statements caused the State of California to submit false and inflated claims to the United States for the federal portion of Medi-Cal in violation of 31 U.S.C. §3729(a)(1)(B).

158.     By virtue of the false or fraudulent claims that Defendant caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

**COUNT III**
**CALIFORNIA FALSE CLAIMS ACT,**
**CAL. GOV'T CODE §§ 12651(a)(1)**
**(Defendants Senior Care Pharmacy Services Inc. And Samitendu Banerjee)**

159.     Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth herein.

160.     Defendant knowingly presents and presented false or fraudulent claims for payment to Medi-Cal in violation of Section 12651(a)(1) of the Act.  Such claims caused actual damages to the State California.

**COUNT IV**
**CALIFORNIA FALSE CLAIMS ACT,**
**CAL. GOV'T CODE §§ 12651(a)(2)**
**(Defendants Senior Care Pharmacy Services Inc. And Samitendu Banerjee)**

161.     Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth herein.

162.     Defendant knowingly makes, uses, made, and used false records or statements material to false or fraudulent claims in violation of Section 12651(a)(2) of the Act.  Such claims caused damages to the State of California.

**PRAYER FOR RELIEF**

WHEREFORE, Relator, on behalf of the United States and the State of California, demand that judgment be entered in his favor and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count. This includes, with respect to the Federal False Claims Act, three times the amount of damages to the Federal Government plus civil penalties of no more than Eleven Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim, and any other recoveries or relief provided for under the Federal False Claims Act and the California False Claims Act.

Further, Relator requests that he receives the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States and the State of California, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that their award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

**INDIVIDUAL CLAIMS OF RELATOR PAUL VILLAMIZAR**

As to the following individual claims, Counts V through XIV, Paul Villamizar is represented by DAVID P. MASTAGNI (SBN 57721), PHILLIP R.A. MASTAGNI (SBN 238254), KENNETH BACON (SBN 104194) and MASTAGNI HOLSTEDT, APC, only.

**FIRST CAUSE OF ACTION-**
**ASSAULT -CAL. PEN. CODE §240**
**(By Paul Villamizar Against Defendants Senior Care Pharmacy Services Inc., Samitendu Banerjee, Ara Keusgarian and Tony Nguyen)**

163.    Relator repeats and re-alleges each and every allegation contained in paragraphs above as though fully set forth.

164.    Relator is informed and believes, and thereon alleges, that at all times relevant herein, each defendant, was the agent, representative, servant and/or employee of every other defendant, who was a principal, master, and/or employer of each other defendant, and every defendant was acting within the course and scope of the agency, authority and/or employment.

Furthermore, each of the defendants was a partner and was engaged in a joint venture with every other defendant, and each defendant was acting within the course, scope, and in furtherance of the partnership and/or joint venture; and each defendant who was a principal, master, and/or employer authorized, ratified, directed, and/or approved the acts, omissions, and conduct of each other defendant; and each defendant assumed the liabilities of every other defendant with respect to the conditions, incident, events, injuries and/or damages referred to herein.

165.    Whenever in this complaint reference is made to any act or omission of any defendants, or any of them,  and/or their agent(s), representative(s), servant(s) and/or employee(s), or of any of them such allegations shall be deemed to mean the act or omission of each defendant, acting individually, jointly, in concert, and severally, and in furtherance of joint activity while actively engaged in the management, direction, control and/or employ of the affairs of defendants, and each of them, and were within the course and scope of their employment, authority, and/or agency, and that the officers, directors, agents, trustees, and/or employees of the defendants did or authorized or ratified such acts or omissions while actively engages in the management, direction, control and/or employ of the affairs of said defendants, and each of them, and were acting within the course and scope of their employment, authority and/or agency.

166.    The California Penal Code, section 240, defines assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."

167.    Relator alleges that on 8/15/2014 he was called to a Senior Care meeting by Samit Banerjee and manages Tony Nguyen, and Ara Keusgarian.

168.    At the meeting Relator was told that he was being discharged for being aggressive regarding his refusal to dispense invalid C2 prescriptions, restock returned medications, and other illegal practices of Senior Care, which Mr. Villamizar had brought to the attention of Senior Care management. They also stated that Relator had several written complaints against him regarding the same.

169.    Relator was offered a document to sign which contained a non-disclosure clause. Relator took the document and said he would review it with an attorney. Banerjee demanded that Relator give the document back or else they would call the police. Relator refused to return the

document. At that point Banerjee, Nguyen and Keusgarian attacked Relator, held him against his will and attempted to take the document from him while Nguyen blocked the door. Banerjee and Keusgarian hit Relator several times with their fists. Relator yelled for help and said, "don't touch me," but they proceeded to hit Relator anyway and threatened him with physical violence and falsely imprisoned him in the conference room.

170. Banerjee, Nguyen and Keusgarian not only attempted, but succeeded in committing a violent act onto Relator by restraining and hitting him.

171. At no time did Relator pose a threat to Banerjee, Nguyen or Keusgarian, nor did he consent to their acts.

172. As a direct and proximate result of the acts committed by Banerjee, Nguyen and Keusgarian, Relator was hurt and injured in his health, strength and activity, sustaining injury to his body and shock and injury to his nervous system and person, all of which said injuries have caused and continue to cause plaintiff great mental, physical, and nervous pain and suffering. Relator is informed and believes, and thereon alleges, that said injuries will result in some permanent disability to the Relator, all to his general damage in an amount to be proven at trial.

173. Accordingly, Banerjee, Keusgarian and Nguyen committed an assault on Relator. Relator is entitled to all relief necessary to make him whole, compensation for all special damages sustained as a result of Defendants' wrongful conduct, past medical damages, future medical damages, past lost wages, future lost wages, lost earning capacity, punitive damages, general damages, emotional distress, pain and suffering, litigation costs and reasonable attorney's fees.

WHEREFORE, Relator, PAUL VILLAMIZAR, prays for judgment against the defendants, and each of them, for:

    1. General damages according to proof;

    2. All medical and incidental expenses according to proof;

    3. All future medical and incidental expenses according to proof;

    4. All loss of earnings and earning capacity according to proof;

    5. Punitive damages according to proof;

46

UNDER SEAL FIRST AMENDED COMPLAINT - *U.S. et al. ex rel. Villamizar v. Senior Care Pharmacy, Inc.*

1   6. All prejudgment interest on general and special damages in accordance with

2   law;

3   7. All property damage, according to proof;

4   8. All costs of suit; and

5   9. Such other and further relief as this Court may deem just and proper.

6

7   **SECOND CAUSE OF ACTION-**
**BATTERY-CAL. PEN. CODE §242**
8   **(By Paul Villamizar Against Defendants Senior Care Pharmacy Services Inc.,**
**Samitendu Banerjee, Ara Keusgarian and Tony Nguyen)**

9   174.    Relator repeat and re-allege each and every allegation contained in the paragraphs

10  above as though fully set forth

11  175.    The California Penal Code, section 242, defines battery as "any willful and

12  unlawful use of force or violence upon the person of another."

13  176.    Relator is informed and believes, and thereon alleges, that at all times relevant

14  herein, each defendant, was the agent, representative, servant and/or employee of every other

15  defendant, who was a principal, master, and/or employer of each other defendant, and every

16  defendant was acting within the course and scope of the agency, authority and/or employment.

17  Furthermore, each of the defendants was a partner and was engaged in a joint venture with every

18  other defendant, and each defendant was acting within the course, scope, and in furtherance of the

19  partnership and/or joint venture; and each defendant who was a principal, master, and/or

20  employer authorized, ratified, directed, and/or approved the acts, omissions, and conduct of each

21  other defendant; and each defendant assumed the liabilities of every other defendant with respect

22  to the conditions, incident, events, injuries and/or damages referred to herein.

23  177.    Whenever in this complaint reference is made to any act or omission of any

24  defendants, or any of them,  and/or their agent(s), representative(s), servant(s) and/or

25  employee(s), or of any of them such allegations shall be deemed to mean the act or omission of

26  each defendant, acting individually, jointly, in concert, and severally, and in furtherance of joint

27  activity while actively engaged in the management, direction, control and/or employ of the affairs

28  of defendants, and each of them, and were within the course and scope of their employment,

authority, and/or agency, and that the officers, directors, agents, trustees, and/or employees of the defendants did or authorized or ratified such acts or omissions while actively engages in the management, direction, control and/or employ of the affairs of said defendants, and each of them, and were acting within the course and scope of their employment, authority and/or agency.

178.    Relator alleges that on 8/15/2014 he was called to a meeting with Samit Banerjee and his associates Tony Nguyen, and Ara Keusgarian.

179.    At the meeting Relator was told that he was being discharged for being aggressive regarding his refusal to dispense invalid C2 prescriptions, restock returned medications, and other illegal practices of Senior Care, which Mr. Villamizar had brought to the attention of Senior Care management. They also stated that Relator had several written complaints against him regarding the same.

180.    Relator was offered a paper to sign which contained a non-disclosure clause. Relator took the document and said he would review it with an attorney. Banerjee demanded that Relator give the document back or else they would call the police. Relator refused to return the document. At that point Banerjee, Nguyen, and Keusgarian attacked Relator, held him against his will and attempted to take document from him while Nguyen blocked the door. Banerjee and Keusgarian hit Relator several times with their fists. Relator yelled for help and said, "don't touch me," but they proceeded to hit Relator anyway, threaten him with physical violence and falsely imprison him in the conference room.

181.    Banerjee, Nguyen and Keusgarian intended to cause and did cause an unlawful use of force and violence against Relator when they restrained Relator against his will and hit him.

182.    At no time did Relator pose a threat to Banerjee, Nguyen or Keusgarian, nor did he consent to their acts.

183.    As a direct and proximate result of the acts committed by Banerjee, Nguyen and Keusgarian, Relator was hurt and injured in his health, strength and activity, sustaining injury to his body and shock and injury to his nervous system and person, all of which said injuries have caused and continue to cause plaintiff great mental, physical, and nervous pain and suffering.

Relator is informed and believes, and thereon alleges, that said injuries will result in some permanent disability to the Relator, all to his general damage in an amount to be proven at trial.

184. Accordingly, Banerjee, Nguyen and Keusgarian committed battery on Relator. Relator is entitled to all relief necessary to make him whole, compensation for all special damages sustained as a result of Defendants' wrongful conduct, past medical damages, future medical damages, past lost wages, future lost wages, lost earning capacity, punitive damages, general damages, emotional distress, pain and suffering, litigation costs and reasonable attorney's fees.

WHEREFORE, Relator, PAUL VILLAMIZAR, prays for judgment against the defendants, and each of them, for:

1. General damages according to proof;

2. All medical and incidental expenses according to proof;

3. All future medical and incidental expenses according to proof;

4. All loss of earnings and earning capacity according to proof;

5. Punitive damages according to proof;

6. All prejudgment interest on general and special damages in accordance with law;

7. All property damage, according to proof;

8. All costs of suit; and

9. Such other and further relief as this Court may deem just and proper.

### THRID CAUSE OF ACTION-
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
**(By Paul Villamizar Against Defendants Senior Care Pharmacy Services Inc., Samitendu Banerjee, Ara Keusgarian and Tony Nguyen)**

185. Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth.

186. In order to state a cause of action for intentional infliction of emotional distress, the plaintiff must prove "(1) outrageous conduct by defendant, (2) defendant intended to cause or acted with reckless disregard of the probability of causing emotional distress, (3) plaintiff

suffered severe or extreme emotional distress, and (4) defendant's outrageous conduct was the actual and proximate cause of plaintiff's emotional distress." Arikat v. JP Morgan Chase & Co., 430 F. Supp. 2d 1013, 1027 (N.D. Cal. 2006).

187.    Relator is informed and believes, and thereon alleges, that at all times relevant herein, each defendant, was the agent, representative, servant and/or employee of every other defendant, who was a principal, master, and/or employer of each other defendant, and every defendant was acting within the course and scope of the agency, authority and/or employment. Furthermore, each of the defendants was a partner and was engaged in a joint venture with every other defendant, and each defendant was acting within the course, scope, and in furtherance of the partnership and/or joint venture; and each defendant who was a principal, master, and/or employer authorized, ratified, directed, and/or approved the acts, omissions, and conduct of each other defendant; and each defendant assumed the liabilities of every other defendant with respect to the conditions, incident, events, injuries and/or damages referred to herein.

188.    Whenever in this complaint reference is made to any act or omission of any defendants, or any of them,  and/or their agent(s), representative(s), servant(s) and/or employee(s), or of any of them such allegations shall be deemed to mean the act or omission of each defendant, acting individually, jointly, in concert, and severally, and in furtherance of joint activity while actively engaged in the management, direction, control and/or employ of the affairs of defendants, and each of them, and were within the course and scope of their employment, authority, and/or agency, and that the officers, directors, agents, trustees, and/or employees of the defendants did or authorized or ratified such acts or omissions while actively engages in the management, direction, control and/or employ of the affairs of said defendants, and each of them, and were acting within the course and scope of their employment, authority and/or agency.

189.    Relator alleges that on 8/15/2014 he was called to a meeting with Banerjee, Nguyen, and Keusgarian.

190.    At the meeting Relator was told that he was being discharged for being aggressive regarding his refusal to dispense invalid C2 prescriptions, restock returned medications, and other

illegal practices of Senior Care, which Mr. Villamizar had brought to the attention of Senior Care management.

191.    Defendant offered Relator a paper to sign which contained a non-disclosure clause. Relator took the document and said he would review it with an attorney. Banerjee demanded that Relator give the document back or else he would call the police. Relator refused to return the document. At that point Banerjee, Nguyen, and Keusgarian attacked Relator, held him against his will and attempted to take document from him while Nguyen blocked the door. Banerjee and Keusgarian hit Relator several times with their fists. Relator yelled for help and said, "don't touch me", but they proceeded to hit Relator anyway.

192.    Banerjee, Nguyen and Keusgarian intended to cause severe emotional distress by bullying Relator into accepting their terms of his discharge. The conduct of Banerjee, Nguyen and Keusgarian was extreme and outrageous when they physically restrained and hit, battered, assaulted, retaliated against, threatened and terminated Relator.

193.    As a direct and proximate result of their conduct, Relator suffered severe emotional distress as well as physical injuries. Relator was hurt and injured in his health, strength and activity, sustaining injury to his body and shock and injury to his nervous system and person, all of which said injuries have caused and continue to cause plaintiff great mental, physical, and nervous pain and suffering.  Relator is informed and believes, and thereon alleges, that said injuries will result in some permanent disability to the Relator, all to his general damage in an amount to be proven at trial.

Accordingly, Banerjee, Nguyen and Keusgarian intentionally inflicted emotional distress on Relator, all to his damage. Relator is entitled to all relief necessary to make him whole, compensation for all special damages sustained as a result of Defendants' wrongful conduct, past medical damages, future medical damages, past lost wages, future lost wages, lost earning capacity, punitive damages, general damages, emotional distress, pain and suffering, litigation costs and reasonable attorney's fees.

WHEREFORE, Relator, PAUL VILLAMIZAR, prays for judgment against the defendants, and each of them, for:

1.  General damages according to proof;

2.  All medical and incidental expenses according to proof;

3.  All future medical and incidental expenses according to proof;

4.  All loss of earnings and earning capacity according to proof;

5.  Punitive damages according to proof;

6.  All prejudgment interest on general and special damages in accordance with law;

7.  All property damage, according to proof;

8.  All costs of suit; and

9.  Such other and further relief as this Court may deem just and proper.

## FOURTH CAUSE OF ACTION-
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
**(By Paul Villamizar Against Defendants Senior Care Pharmacy Services Inc., Samitendu Banerjee, Ara Keusgarian and Tony Nguyen)**

194.   Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth

195.   Cal. Civ. Code section 1714 states that "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself."

196.   Relator is informed and believes, and thereon alleges, that at all times relevant herein, each defendant, was the agent, representative, servant and/or employee of every other defendant, who was a principal, master, and/or employer of each other defendant, and every defendant was acting within the course and scope of the agency, authority and/or employment. Furthermore, each of the defendants was a partner and was engaged in a joint venture with every other defendant, and each defendant was acting within the course, scope, and in furtherance of the partnership and/or joint venture; and each defendant who was a principal, master, and/or employer authorized, ratified, directed, and/or approved the acts, omissions, and conduct of each

other defendant; and each defendant assumed the liabilities of every other defendant with respect to the conditions, incident, events, injuries and/or damages referred to herein.

197.    Whenever in this complaint reference is made to any act or omission of any defendants, or any of them, and/or their agent(s), representative(s), servant(s) and/or employee(s), or of any of them such allegations shall be deemed to mean the act or omission of each defendant, acting individually, jointly, in concert, and severally, and in furtherance of joint activity while actively engaged in the management, direction, control and/or employ of the affairs of defendants, and each of them, and were within the course and scope of their employment, authority, and/or agency, and that the officers, directors, agents, trustees, and/or employees of the defendants did or authorized or ratified such acts or omissions while actively engages in the management, direction, control and/or employ of the affairs of said defendants, and each of them, and were acting within the course and scope of their employment, authority and/or agency.

198.    Relator alleges that on 8/15/2014 he was called to a meeting with Samit Banerjee, Tony Nguyen, and Ara Keusgarian.

199.    At the meeting Relator was told that he was being discharged for being aggressive regarding his refusal to dispense invalid C2 prescriptions, restock returned medications, and other illegal practices of Senior Care, which Mr. Villamizar had brought to the attention of Senior Care management.

200.    Defendant offered Relator a paper to sign which contained a non-disclosure clause. Relator took the document and said he would review it with an attorney. Banerjee demanded that Relator give the document back or else he would call the police. Relator refused to return the document. At that point Banerjee, Nguyen, and Keusgarian attacked Relator, held him against his will and attempted to take document from him while Nguyen blocked the door. Banerjee and Keusgarian hit Relator several times with their fists. Relator yelled for help and said, "don't touch me", but they proceeded to hit Relator anyway.

201.    Banerjee, Nguyen and Keusgarian failed to use ordinary care on this occasion, and caused Relator to suffer severe emotional distress as well as physical injuries.

202.    Relator was hurt and injured in his health, strength and activity, sustaining injury to his body and shock and injury to his nervous system and person, all of which said injuries have caused and continue to cause plaintiff great mental, physical, and nervous pain and suffering. Relator is informed and believes, and thereon alleges, that said injuries will result in some permanent disability to the Relator, all to his general damage in an amount to be proven at trial.

203.    Accordingly, Banerjee, Nguyen and Keusgarian negligently inflicted emotional distress on Relator, all to his damage. Relator is entitled to all relief necessary to make him whole, compensation for all special damages sustained as a result of Defendants' negligence, past medical damages, future medical damages, past lost wages, future lost wages, lost earning capacity, general damages, emotional distress, pain and suffering, litigation costs and reasonable attorney's fees.

WHEREFORE, Relator, PAUL VILLAMIZAR, prays for judgment against the defendants, and each of them, for:

1. General damages according to proof;

2. All medical and incidental expenses according to proof;

3. All future medical and incidental expenses according to proof;

4. All loss of earnings and earning capacity according to proof;

5. All prejudgment interest on general and special damages in accordance with law;

6. All property damage, according to proof;

7. All costs of suit; and

8. Such other and further relief as this Court may deem just and proper.

### FIFTH CAUSE OF ACTION-
### WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY
**(By Paul Villamizar Against Defendants Senior Care Pharmacy Services Inc., Samitendu Banerjee, Ara Keusgarian and Tony Nguyen)**

204.    Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth.

205.    To support a cause of action for wrongful termination in violation of public policy,

the plaintiff must prove the following: "First, the policy must be supported by either constitutional or statutory provisions. Second, the policy must be 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual. Third, the policy must have been articulated at the time of the discharge. Fourth, the policy must be 'fundamental' and 'substantial.'" Ross v. RagingWire Telecommunications, Inc., 42 Cal. 4th 920, 932, 174 P.3d 200, 208 (2008).

206. Relator is informed and believes, and thereon alleges, that at all times relevant herein, each defendant, was the agent, representative, servant and/or employee of every other defendant, who was a principal, master, and/or employer of each other defendant, and every defendant was acting within the course and scope of the agency, authority and/or employment. Furthermore, each of the defendants was a partner and was engaged in a joint venture with every other defendant, and each defendant was acting within the course, scope, and in furtherance of the partnership and/or joint venture; and each defendant who was a principal, master, and/or employer authorized, ratified, directed, and/or approved the acts, omissions, and conduct of each other defendant; and each defendant assumed the liabilities of every other defendant with respect to the conditions, incident, events, injuries and/or damages referred to herein.

207. Whenever in this complaint reference is made to any act or omission of any defendants, or any of them, and/or their agent(s), representative(s), servant(s) and/or employee(s), or of any of them such allegations shall be deemed to mean the act or omission of each defendant, acting individually, jointly, in concert, and severally, and in furtherance of joint activity while actively engaged in the management, direction, control and/or employ of the affairs of defendants, and each of them, and were within the course and scope of their employment, authority, and/or agency, and that the officers, directors, agents, trustees, and/or employees of the defendants did or authorized or ratified such acts or omissions while actively engages in the management, direction, control and/or employ of the affairs of said defendants, and each of them, and were acting within the course and scope of their employment, authority and/or agency.

208. On August 15, 2014, Relator was discharged from Senior Care by Defendants Senior Care, Samit Banerjee, Tony Nguyen, and Ara Keusgarian at the meeting described herein

**55**

UNDER SEAL FIRST AMENDED COMPLAINT - *U.S. et al. ex rel. Villamizar v. Senior Care Pharmacy, Inc.*

1 above, when Relator was assaulted, battered, retaliated against, and terminated by Defendants

2 because of his acts as a whistle blower against Defendants unlawful practices as described herein

3 above. Relator's act is supported by the following relevant statutory provisions: Cal. Gov. Code

4 §12653, and 31 USC §3730.

5       209.   Relator's acts as a whistleblower benefits the public. Defendants were improperly

6 re-stocking, re-selling, and swapping different forms of drugs, which is dangerous to public

7 health. Defendants was also over-billing and double-billing for drugs which is unfair practice to

8 customers. Defendant was also improperly dispensing and storing C-2 narcotics, which is illegal.

9 For example, California Business and Profession Code Section 4119 et. Seq. regulates the

10 furnishing of dangerous drugs in a secured emergency pharmaceutical supplies container was

11 regularly violated by Defendants who instructed Relator and SNF's to use emergency supplies of

12 pharmaceuticals in non-emergency circumstances. Relator complained that said conduct was

13 illegal and took steps to documents violations; and therefore, was retaliated against, assaulted,

14 battered, retaliated against, and terminated. Likewise, Defendants violated California Business

15 and Professions Code Section 4115, which regulates tasks that a pharmacy technician may

16 perform. Defendants regularly allowed and/or ordered pharmacy technicians to violate California

17 Business and Professions Code Section 4115, ordering the technicians to disregard Mr.

18 Villamizar, work without the supervision of a pharmacist, and to violate California and Federal

19 laws after Mr. Villamizar had instructed technicians not to engage in conduct that violated

20 California and Federal law. Whenever Relator complained of the violated stated herein, pharmacy

21 technicians were told to disregard Mr. Villamizar, and he was retaliated against culminating him

22 being assaulted, battered, retaliated against, and terminated.

23       210.   The violation of California and Federal laws set forth herein above are matter of

24 public policy relevant to this case and were articulated at the time Relator was discharged.

25       211.   The policies relevant to this case are fundamental and substantial, because they

26 encourage employees to report abusive practices by employers that put public health, safety and

27 welfare at risk. As a result of Defendants' wrongful conduct, Relator is entitled to all relief

28 necessary to make him whole, reinstatement with the same seniority status that Relator would

have had but for the discrimination, back pay, interest on the back pay, compensation for all special damages sustained as a result of the discrimination, past medical damages, future medical damages, past lost wages, future lost wages, lost earning capacity, punitive damages, litigation costs and reasonable attorney's fees.

WHEREFORE, Relator, PAUL VILLAMIZAR, prays for judgment against the defendants, and each of them, for:

1. General damages according to proof;

2. All medical and incidental expenses according to proof;

3. All future medical and incidental expenses according to proof;

4. All loss of earnings and earning capacity and back pay according to proof;

5. Reinstatement with the same seniority status that Relator would have had but for the discrimination;

6. Punitive damages according to proof;

7. All prejudgment interest on general and special damages in accordance with law;

8. All property damage, according to proof;

9. All costs of suit and reasonable attorney's fees; and

10. Such other and further relief as this Court may deem just and proper.

### SIXTH CAUSE OF ACTION-
### WHISTLE BLOWER RETALIATION- CAL. GOV. CODE § 12653
**(By Paul Villamizar Against Defendants Senior Care Pharmacy Services Inc., Samitendu Banerjee, Ara Keusgarian and Tony Nguyen)**

212. Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth.

213. Section 12653(a) of the California Government code states that "Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of his or her employment because of lawful acts done by the employee, contractor, agent, or associated others

in furtherance of an action under this section or other efforts to stop one or more violations of this article."

214.     Relator is informed and believes, and thereon alleges, that at all times relevant herein, each defendant, was the agent, representative, servant and/or employee of every other defendant, who was a principal, master, and/or employer of each other defendant, and every defendant was acting within the course and scope of the agency, authority and/or employment. Furthermore, each of the defendants was a partner and was engaged in a joint venture with every other defendant, and each defendant was acting within the course, scope, and in furtherance of the partnership and/or joint venture; and each defendant who was a principal, master, and/or employer authorized, ratified, directed, and/or approved the acts, omissions, and conduct of each other defendant; and each defendant assumed the liabilities of every other defendant with respect to the conditions, incident, events, injuries and/or damages referred to herein.

215.     Whenever in this complaint reference is made to any act or omission of any defendants, or any of them, and/or their agent(s), representative(s), servant(s) and/or employee(s), or of any of them such allegations shall be deemed to mean the act or omission of each defendant, acting individually, jointly, in concert, and severally, and in furtherance of joint activity while actively engaged in the management, direction, control and/or employ of the affairs of defendants, and each of them, and were within the course and scope of their employment, authority, and/or agency, and that the officers, directors, agents, trustees, and/or employees of the defendants did or authorized or ratified such acts or omissions while actively engages in the management, direction, control and/or employ of the affairs of said defendants, and each of them, and were acting within the course and scope of their employment, authority and/or agency.

216.     On August 15, 2014, Relator was discharged from Senior Care by Defendants Senior Care, Samit Banerjee, Tony Nguyen, and Ara Keusgarian at the meeting described herein above, when Relator was assaulted, battered, retaliated against, and terminated by Defendants. Relator was told that he was being discharged for being aggressive regarding his refusal to dispense invalid C2 prescriptions, restock returned medications, and other illegal practices of Senior Care as set forth herein above, which Mr. Villamizar had brought to the attention of Senior

Care management. The real reason for Relator's discharge was retaliation and discrimination for being a whistle blower, complaining about Senior Care's illegal practices, refusing to participate in Senior Care's illegal practices, researching and documenting those unlawful practices, and reported the same to others. Defendants attempted to silence Mr. Villamizar by violence and intimidation, and by trying to force him by violence and intimidation to sign a non-disclosure document.

217. As a result of Defendants' Whistle Blower Retaliation, Relator is entitled to all relief necessary to make him whole, reinstatement with the same seniority status that Relator would have had but for the discrimination, two times Relator's back pay, interest on the back pay, compensation for all special damages sustained as a result of the discrimination, past medical damages, future medical damages, past lost wages, future lost wages, lost earning capacity, punitive damages, litigation costs and reasonable attorney's fees.

WHEREFORE, Relator, PAUL VILLAMIZAR, prays for judgment against the defendants, and each of them, for:

1. General damages according to proof;

2. All medical and incidental expenses according to proof;

3. All future medical and incidental expenses according to proof;

4. Two times Relator's back pay;

5. Interest on the back pay;

6. All loss of earnings and earning capacity according to proof;

7. Reinstatement with the same seniority status that Relator would have had but for the discrimination;

8. Punitive damages according to proof;

9. All prejudgment interest on general and special damages in accordance with law;

10. All property damage, according to proof;

11. All costs of suit and reasonable attorney's fees; and

12. Such other and further relief as this Court may deem just and proper.

59

UNDER SEAL FIRST AMENDED COMPLAINT - *U.S. et al. ex rel. Villamizar v. Senior Care Pharmacy, Inc.*

## SEVENTH CAUSE OF ACTION-
## QUI TAM RETALIATION- 31 USC §3730(h)(1)
### (By Paul Villamizar Against Defendants Senior Care Pharmacy Services Inc., Samitendu Banerjee, Ara Keusgarian and Tony Nguyen)

218.    Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth.

219.    31 USC section 3730(h)(1) states that "Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."

220.    Relator is informed and believes, and thereon alleges, that at all times relevant herein, each defendant, was the agent, representative, servant and/or employee of every other defendant, who was a principal, master, and/or employer of each other defendant, and every defendant was acting within the course and scope of the agency, authority and/or employment. Furthermore, each of the defendants was a partner and was engaged in a joint venture with every other defendant, and each defendant was acting within the course, scope, and in furtherance of the partnership and/or joint venture; and each defendant who was a principal, master, and/or employer authorized, ratified, directed, and/or approved the acts, omissions, and conduct of each other defendant; and each defendant assumed the liabilities of every other defendant with respect to the conditions, incident, events, injuries and/or damages referred to herein.

221.    Whenever in this complaint reference is made to any act or omission of any defendants, or any of them, and/or their agent(s), representative(s), servant(s) and/or employee(s), or of any of them such allegations shall be deemed to mean the act or omission of each defendant, acting individually, jointly, in concert, and severally, and in furtherance of joint activity while actively engaged in the management, direction, control and/or employ of the affairs of defendants, and each of them, and were within the course and scope of their employment, authority, and/or agency, and that the officers, directors, agents, trustees, and/or employees of the

defendants did or authorized or ratified such acts or omissions while actively engages in the management, direction, control and/or employ of the affairs of said defendants, and each of them, and were acting within the course and scope of their employment, authority and/or agency.

222.    On August 15, 2014, Relator was discharged from Senior Care by Defendants Senior Care, Samit Banerjee, Tony Nguyen, and Ara Keusgarian at the meeting described herein above, when Relator was assaulted, battered, retaliated against, and terminated by Defendants. Relator was told that he was being discharged for being aggressive regarding his refusal to dispense invalid C2 prescriptions, restock returned medications, and other illegal practices of Senior Care as set forth herein above, which Mr. Villamizar had brought to the attention of Senior Care management. The real reason for Relator's discharge was retaliation and discrimination for being a whistle blower, complaining about Senior Care's illegal practices, refusing to participate in Senior Care's illegal practices, researching and documenting those unlawful practices, and reported the same to others. Defendants attempted to silence Mr. Villamizar by violence and intimidation, and by trying to force him by violence and intimidation to sign a non-disclosure document.

223.    As a result of Defendant's Qui Tam retaliation, Relator is entitled to all relief necessary to make him whole, reinstatement with the same seniority status that Relator would have had but for the discrimination, two times Relator's back pay, interest on the back pay, compensation for all special damages sustained as a result of the discrimination, past medical damages, future medical damages, past lost wages, future lost wages, lost earning capacity, punitive damages, litigation costs and reasonable attorney's fees.

WHEREFORE, Relator, PAUL VILLAMIZAR, prays for judgment against the defendants, and each of them, for:

1.  General damages according to proof;

2.  All medical and incidental expenses according to proof;

3.  All future medical and incidental expenses according to proof;

4.  Two times Relator's back pay;

5. Interest on the back pay;

6. All loss of earnings and earning capacity according to proof;

7. Reinstatement with the same seniority status that Relator would have had but for the discrimination;

8. Punitive damages according to proof;

9. All prejudgment interest on general and special damages in accordance with law;

10. All property damage, according to proof;

11. All costs of suit and reasonable attorney's fees; and

12. Such other and further relief as this Court may deem just and proper.

## EIGHTH CAUSE OF ACTION-
## VIOLENCE AND INTIMIDATION- CAL. CIV. CODE § 51.7
**(By Paul Villamizar Against Defendants Senior Care Pharmacy Services Inc., Samitendu Banerjee, Ara Keusgarian and Tony Nguyen)**

224. Cal. Civ. Code section 51.7 states that, "All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation, … or position in a labor dispute."

225. Relator is informed and believes, and thereon alleges, that at all times relevant herein, each defendant, was the agent, representative, servant and/or employee of every other defendant, who was a principal, master, and/or employer of each other defendant, and every defendant was acting within the course and scope of the agency, authority and/or employment. Furthermore, each of the defendants was a partner and was engaged in a joint venture with every other defendant, and each defendant was acting within the course, scope, and in furtherance of the partnership and/or joint venture; and each defendant who was a principal, master, and/or employer authorized, ratified, directed, and/or approved the acts, omissions, and conduct of each other defendant; and each defendant assumed the liabilities of every other defendant with respect to the conditions, incident, events, injuries and/or damages referred to herein.

226. Whenever in this complaint reference is made to any act or omission of any defendants, or any of them, and/or their agent(s), representative(s), servant(s) and/or employee(s), or of any of them such allegations shall be deemed to mean the act or omission of

each defendant, acting individually, jointly, in concert, and severally, and in furtherance of joint activity while actively engaged in the management, direction, control and/or employ of the affairs of defendants, and each of them, and were within the course and scope of their employment, authority, and/or agency, and that the officers, directors, agents, trustees, and/or employees of the defendants did or authorized or ratified such acts or omissions while actively engages in the management, direction, control and/or employ of the affairs of said defendants, and each of them, and were acting within the course and scope of their employment, authority and/or agency.

227.    On August 15, 2014, Relator was discharged from Senior Care by Defendants Senior Care, Samit Banerjee, Tony Nguyen, and Ara Keusgarian at the meeting described herein above, when Relator was assaulted, battered, retaliated against, and terminated by Defendants. Relator was told that he was being discharged for being aggressive regarding his refusal to dispense invalid C2 prescriptions, restock returned medications, and other illegal practices of Senior Care as set forth herein above, which Mr. Villamizar had brought to the attention of Senior Care management. The real reason for Relator's discharge was retaliation and discrimination for being a whistle blower, complaining about Senior Care's illegal practices, refusing to participate in Senior Care's illegal practices, researching and documenting those unlawful practices, and reported the same to others. Defendants attempted to silence Mr. Villamizar by violence and intimidation, and by trying to force him by violence and intimidation to sign a non-disclosure document. Defendants threatened and intimidated Mr. Villamizar based on his race and national origin, including, but not limited to threatening physical violence, threatening to have him sent back to Canada, threatening his immigration status and ability to find other work if her did not given to Defendants demands to violate state and federal law, which was the subject of an ongoing labor dispute, and sign a non-disclosure agreement regarding their labor dispute.

228.    Relator was called to a meeting with Banerjee, Nguyen and Keusgarian on 8/15/2104, and was told that he was being discharged. Relator was then offered a paper to sign which contained a non-disclosure clause. Relator took the document and said he would review it with an attorney. At that point, Relator was detained against his will and physically attacked by

1  Banerjee, Nguyen, and Keusgarian. He was told he would be sent back to Canada, never find

2  another job in the US, and lose his visa if he did not given in to their threats and violence.

3      229.   As a result of Defendants' use of violence, threats and intimidation, Relator is

4  entitled to all relief necessary to make him whole, reinstatement with the same seniority status

5  that Relator would have had but for the discrimination, back pay, interest on the back pay,

6  compensation for all special damages sustained as a result of the discrimination, past medical

7  damages, future medical damages, past lost wages, future lost wages, lost earning capacity,

8  punitive damages, litigation costs and reasonable attorney's fees.

9      WHEREFORE, Relator, PAUL VILLAMIZAR, prays for judgment against the

10 defendants, and each of them, for:

11     1. General damages according to proof;

12     2. All medical and incidental expenses according to proof;

13     3. All future medical and incidental expenses according to proof;

14     4. All loss of earnings and earning capacity and back pay according to proof;

15     5. Reinstatement with the same seniority status that Relator would have had but

16     for the discrimination;

17     6. Punitive damages according to proof;

18     7. All prejudgment interest on general and special damages in accordance with

19     law;

20     8. All property damage, according to proof;

21     9. All costs of suit and reasonable attorney's fees; and

22     10. Such other and further relief as this Court may deem just and proper.

23     **<u>DEMAND FOR JURY PURSUANT TO RULE 38(b)</u>**

24     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Relator hereby

25 demands a Trial by Jury on all Counts and to all issues of this Complaint.

26

27

28

64

<u>UNDER SEAL FIRST AMENDED COMPLAINT</u> - *U.S. et al. ex rel. Villamizar v. Senior Care Pharmacy, Inc.*

Dated: October 21, 2016

Respectfully submitted,

**MASTAGNI HOLSTEDT, APC**

*/s/ Phillip R.A. Mastagni* (SBN 238254)
1912 "I" Street, Sacramento, California 95811
Telephone: (916) 446-4692
Facsimile: (916) 447-4614
Email: dmastagni@mastagni.com
Email: phillip@mastagni.com
Email: kbacon@mastagni.com

BERGER & MONTAGUE, P.C.
Daniel R. Miller (PA Bar No. 68141; DE Bar No. 3169)
Russell D. Paul (PA Bar No.71220; DE Bar No. 4647)
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
Email: dmiller@bm.net
Email: rpaul@bm.net

65

UNDER SEAL FIRST AMENDED COMPLAINT - *U.S. et al. ex rel. Villamizar v. Senior Care Pharmacy, Inc.*

CERTIFICATE OF SERVICE

SHORT TITLE OF CASE: ***Villamizar et al., v. Senior Care Pharmacy Services Inc., et al.***
COURT NAME: ***US District Court Eastern Division***
CASE NUMBER: ***Case No.: 2:14-CV-1737-TLN-KJN***

    I am a citizen of the United States and a resident of the County of Sacramento. I am over the age of 18 years and am not a party to the within action. My business address is 1912 I Street, Sacramento, CA 95811. On the date set forth below, I served the below-described document(s), on the parties listed herein, at the addresses set forth below, by serving a true copy, or original as required by law, of each by the following means of service:

**BY MAIL:** by placing the document(s) listed below in a sealed envelope with postage thereon fully prepaid, in the United States mail at Sacramento, California addressed as set forth below.

NAME/DESCRIPTION OF DOCUMENT(S) SERVED:

**FIRST AMENDED COMPLAINT ; FILED IN CAMERA AND UNDER SEAL**

ADDRESSES OF SERVICE:

| | |
|---|---|
| Edward A. Baker<br>Assistant United States Attorney<br>501 I Street, 10th Floor<br>Sacramento, CA 95814 | Steven A. Block<br>Deputy Attorney General<br>Bureau of Medi-Cal Fraud and Elder Abuse<br>(BMFEA)<br>Office of the Attorney General<br>State of California Department of Justice<br>1425 River Park Drive, Suite 300<br>Sacramento, CA 95815 |
| Benjamin C. Mizer<br>Principal Deputy Assistant Attorney General<br>Michael D. Granson<br>Brian McCabe<br>Patricia Hanower<br>Department of Justice<br>Commercial Litigation Branch<br>Civil Division<br>PO Box 261<br>Benjamin Franklin Station<br>Washington, D.C. 20044 | Russell Paul<br>Berger & Montague, P.D.<br>1622 Locust Street<br>Philadelphia, PA 19103 |

    I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct. I executed on October 21, 2016, at Sacramento, California.

*/s/ Anita Estioko*
Anita Estioko